## BLUE CHIP STAMPS ET AL. *v.* MANOR DRUG STORES

No. 74–124.   Argued March 24, 1975—Decided June 9, 1975

724

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, in which STEWART and MARSHALL, JJ., joined, *post,* p. 755. BLACKMUN, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post,* p. 761.

*Allyn O. Kreps* argued the cause for petitioners. With

him on the briefs were *Michael D. Zimmerman, G. Richard Doty,* and *Thomas J. Ready.*

*James E. Ryan* argued the cause for respondent. With him on the brief was *J. J. Brandlin.*

*David Ferber* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Bork, Lawrence E. Nerheim,* and *Richard E. Nathan.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This case requires us to consider whether the offerees of a stock offering, made pursuant to an antitrust consent decree and registered under the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.* (1933 Act), may maintain a private cause of action for money damages where they allege that the offeror has violated the provisions of Rule 10b–5 of the Securities and Exchange Commission, but where they have neither purchased nor sold any of the offered shares. See *Birnbaum* v. *Newport Steel Corp.,* 193 F. 2d 461 (CA2), cert. denied, 343 U. S. 956 (1952).

I

In 1963 the United States filed a civil antitrust action against Blue Chip Stamp Co. (Old Blue Chip), a company in the business of providing trading stamps to retailers, and nine retailers who owned 90% of its shares. In 1967 the action was terminated by the entry of a consent decree. *United States* v. *Blue Chip Stamp Co.,* 272 F. Supp. 432 (CD Cal.), aff'd *sub nom. Thrifty Shoppers Scrip Co.* v. *United States,* 389 U. S. 580 (1968).[1] The decree contemplated a plan of reorganiza-

---

[1] Neither respondent nor any of the members of its alleged class were parties to the antitrust action. The antitrust decree itself

tion whereby Old Blue Chip was to be merged into a newly formed corporation, Blue Chip Stamps (New Blue Chip). The holdings of the majority shareholders of Old Blue Chip were to be reduced, and New Blue Chip, one of the petitioners here, was required under the plan to offer a substantial number of its shares of common stock to retailers who had used the stamp service in the past but who were not shareholders in the old company. Under the terms of the plan, the offering to nonshareholder users was to be proportional to past stamp usage and the shares were to be offered in units consisting of common stock and debentures.

The reorganization plan was carried out, the offering was registered with the SEC as required by the 1933 Act, and a prospectus was distributed to all offerees as required by § 5 of that Act, 15 U. S. C. § 77e. Somewhat more than 50% of the offered units were actually purchased. In 1970, two years after the offering, respondent, a former user of the stamp service and therefore an offeree of the 1968 offering, filed this suit in the United States District Court for the Central District of California. Defendants below and petitioners here are Old and New Blue Chip, eight of the nine majority shareholders of Old Blue Chip, and the directors of New Blue Chip (collectively called Blue Chip).

Respondent's complaint alleged, *inter alia,* that the prospectus prepared and distributed by Blue Chip in connection with the offering was materially misleading in its overly pessimistic appraisal of Blue Chip's status and future prospects. It alleged that Blue Chip intentionally made the prospectus overly pessimistic in order to discourage respondent and other members of the allegedly large class whom it represents from accepting what was

provided no plan for the reorganization of Old Blue Chip but instead merely directed the parties to the consent decree to present to the court such a plan. App. 27, 31.

intended to be a bargain offer, so that the rejected shares might later be offered to the public at a higher price. The complaint alleged that class members because of and in reliance on the false and misleading prospectus failed to purchase the offered units. Respondent therefore sought on behalf of the alleged class some $21,400,000 in damages representing the lost opportunity to purchase the units; the right to purchase the previously rejected units at the 1968 price; and in addition, it sought some $25,000,000 in exemplary damages.

The only portion of the litigation thus initiated which is before us is whether respondent may base its action on Rule 10b–5 of the Securities and Exchange Commission without having either bought or sold the securities described in the allegedly misleading prospectus. The District Court dismissed respondent's complaint for failure to state a claim upon which relief might be granted.[2] On appeal to the United States Court of Appeals for the Ninth Circuit, respondent pressed only its asserted claim under Rule 10b–5, and a divided panel of the Court of Appeals sustained its position and reversed the District Court.[3] After the Ninth Circuit denied rehearing en banc, we granted Blue Chip's petition for certiorari. 419 U. S. 992 (1974). Our consideration of the correctness of the determination of the Court of Appeals requires us to consider what limitations there are on the class of plaintiffs who may maintain a private cause of action for money damages for violation of Rule 10b–5, and whether respondent was within that class.

## II

During the early days of the New Deal, Congress enacted two landmark statutes regulating securities.

---

[2] The District Court opinion is reported at 339 F. Supp. 35 (1971).

[3] The Court of Appeals opinion is reported at 492 F. 2d 136 (1973).

The 1933 Act was described as an Act to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes." The Securities Exchange Act of 1934. 48 Stat. 881, as amended, 15 U. S. C. § 78a et seq. (1934 Act), was described as an Act "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes."

The various sections of the 1933 Act dealt at some length with the required contents of registration statements and prospectuses, and expressly provided for private civil causes of action. Section 11 (a) gave a right of action by reason of a false registration statement to "any person acquiring" the security, and § 12 of that Act gave a right to sue the seller of a security who had engaged in proscribed practices with respect to prospectuses and communication to "the person purchasing such security from him."

The 1934 Act was divided into two titles. Title I was denominated "Regulation of Securities Exchanges," and Title II was denominated "Amendments to Securities Act of 1933." Section 10 of that Act makes it "unlawful for any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." The "Commission" referred to in the section was the Securities and Exchange Commis-

sion created by § 4 (a) of the 1934 Act. Section 29 of that Act provided that "[e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder" should be void.

In 1942, acting under the authority granted to it by § 10 (b) of the 1934 Act, the Commission promulgated Rule 10b–5, 17 CFR § 240.10b–5, now providing as follows:

> "§ 240.10b–5 Employment of manipulative and deceptive devices.
>
> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."

Section 10 (b) of the 1934 Act does not by its terms provide an express civil remedy for its violation. Nor does the history of this provision provide any indication that Congress considered the problem of private suits under it at the time of its passage. See, *e. g.,* Note, Implied Liability Under the Securities Exchange Act, 61 Harv. L. Rev. 858, 861 (1948); A. Bromberg, Securities Law: Fraud—SEC Rule 10b–5 § 2.2 (300)–(340) (1968) (hereinafter Bromberg); S. Rep. No. 792, 73d Cong., 2d

Sess., 5–6 (1934). Similarly there is no indication that the Commission in adopting Rule 10b–5 considered the question of private civil remedies under this provision. SEC Securities Exchange Act Release No. 3230 (1942); Conference on Codification of the Federal Securities Laws, 22 Bus. Law. 793, 922 (1967); *Birnbaum* v. *Newport Steel Corp.*, 193 F. 2d, at 463; 3 L. Loss, Securities Regulation 1469 n. 87 (2d ed. 1961).

Despite the contrast between the provisions of Rule 10b–5 and the numerous carefully drawn express civil remedies provided in the Acts of both 1933 and 1934,[4] it was held in 1946 by the United States District Court for the Eastern District of Pennsylvania that there was an implied private right of action under the Rule. *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512. This Court had no occasion to deal with the subject until 25 years later, and at that time we confirmed with virtually no discussion the overwhelming consensus of the District Courts and Courts of Appeals that such a cause of action did exist. *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6, 13 n. 9 (1971); *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 150–154 (1972). Such a conclusion was, of course, entirely consistent with the Court's recognition in *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 432 (1964), that private enforcement of Commission rules may "[provide] a necessary supplement to Commission action."

Within a few years after the seminal *Kardon* decision, the Court of Appeals for the Second Circuit concluded that the plaintiff class for purposes of a private damage action under § 10 (b) and Rule 10b–5 was limited to actual purchasers and sellers of securities. *Birnbaum* v. *Newport Steel Corp.*, *supra*.

---

[4] See, *e. g.*, §§ 11, 12, 15 of the 1933 Act, 15 U. S. C. §§ 77k, 77*l*, 77*o*; §§ 9, 16, 18, 20 of the 1934 Act, 15 U. S. C. §§ 78i, 78p, 78r, 78t.

The Court of Appeals in this case did not repudiate *Birnbaum;* indeed, another panel of that court (in an opinion by Judge Ely) had but a short time earlier affirmed the rule of that case. *Mount Clemens Industries, Inc.* v. *Bell,* 464 F. 2d 339 (1972). But in this case a majority of the Court of Appeals found that the facts warranted an exception to the *Birnbaum* rule. For the reasons hereinafter stated, we are of the opinion that *Birnbaum* was rightly decided, and that it bars respondent from maintaining this suit under Rule 10b–5.

## III

The panel which decided *Birnbaum* consisted of Chief Judge Swan and Judges Learned Hand and Augustus Hand: the opinion was written by the last named. Since both § 10 (b) and Rule 10b–5 proscribed only fraud "in connection with the purchase or sale" of securities, and since the history of § 10 (b) revealed no congressional intention to extend a private civil remedy for money damages to other than defrauded purchasers or sellers of securities, in contrast to the express civil remedy provided by § 16 (b) of the 1934 Act, the court concluded that the plaintiff class in a Rule 10b–5 action was limited to actual purchasers and sellers. 193 F. 2d, at 463–464.

Just as this Court had no occasion to consider the validity of the *Kardon* holding that there was a private cause of action under Rule 10b–5 until 20-odd years later, nearly the same period of time has gone by between the *Birnbaum* decision and our consideration of the case now before us. As with *Kardon,* virtually all lower federal courts facing the issue in the hundreds of reported cases presenting this question over the past quarter century have reaffirmed *Birnbaum*'s conclusion that the plaintiff class for purposes of § 10 (b) and Rule 10b–5 private damage actions is limited to purchasers and sell-

ers of securities. See 6 L. Loss, Securities Regulation 3617 (1969). See, *e. g., Haberman* v. *Murchison,* 468 F. 2d 1305, 1311 (CA2 1972); *Landy* v. *FDIC,* 486 F. 2d 139, 156–157 (CA3 1973), cert. denied, 416 U. S. 960 (1974); *Sargent* v. *Genesco, Inc.,* 492 F. 2d 750, 763 (CA5 1974); *Simmons* v. *Wolfson,* 428 F. 2d 455, 456 (CA6 1970), cert. denied, 400 U. S. 999 (1971); *City National Bank* v. *Vanderboom,* 422 F. 2d 221, 227–228 (CA8), cert. denied, 399 U. S. 905 (1970); *Mount Clemens Industries, Inc.* v. *Bell, supra; Jensen* v. *Voyles,* 393 F. 2d 131, 133 (CA10 1968). Compare *Eason* v. *General Motors Acceptance Corp.,* 490 F. 2d 654 (CA7 1973), cert. denied, 416 U. S. 960 (1974), with *Dasho* v. *Susquehanna Corp.,* 380 F. 2d 262 (CA7), cert. denied *sub nom. Bard* v. *Dasho,* 389 U. S. 977 (1967).

In 1957 and again in 1959, the Securities and Exchange Commission sought from Congress amendment of § 10 (b) to change its wording from "in connection with the purchase or sale of any security" to "in connection with the purchase or sale of, *or any attempt to purchase or sell,* any security." 103 Cong. Rec. 11636 (1957) (emphasis added); SEC Legislation, Hearings on S. 1178–1182 before a Subcommittee of the Senate Committee on Banking & Currency, 86th Cong., 1st Sess., 367–368 (1959); S. 2545, 85th Cong., 1st Sess. (1957); S. 1179, 86th Cong., 1st Sess. (1959). In the words of a memorandum submitted by the Commission to a congressional committee, the purpose of the proposed change was "to make section 10 (b) also applicable to manipulative activities in connection with any attempt to purchase or sell any security." Hearings on S. 1178–1182, *supra,* at 331. Opposition to the amendment was based on fears of the extension of civil liability under § 10 (b) that it would cause. *Id.,* at 368. Neither change was adopted by Congress.

The longstanding acceptance by the courts, coupled with Congress' failure to reject *Birnbaum*'s reasonable interpretation of the wording of § 10 (b), wording which is directed toward injury suffered "in connection with the purchase or sale" of securities,[5] argues significantly in favor of acceptance of the *Birnbaum* rule by this Court. *Blau* v. *Lehman*, 368 U. S. 403, 413 (1962).

Available evidence from the texts of the 1933 and 1934 Acts as to the congressional scheme in this regard, though not conclusive, supports the result reached by the *Birnbaum* court. The wording of § 10 (b) directed at fraud "in connection with the purchase or sale" of securities stands in contrast with the parallel antifraud provision of the 1933 Act, § 17 (a), as amended, 68 Stat. 686, 15 U. S. C. § 77q,[6] reaching fraud

---

[5] MR. JUSTICE BLACKMUN, dissenting, *post*, at 764–765, finds support in the literal language of § 10 (b) since he concludes that in his view "the word 'sale' ordinarily and naturally may be understood to mean, not only a single, individualized act transferring property from one party to another, but also the generalized event of public disposal of property through advertisement, auction, or some other market mechanism." But this ignores the fact that this carefully drawn statute itself defines the term "sale" for purposes of the Act, and, as we have noted, *infra*, at 751 n. 13, Congress expressly deleted from the Act's definition events such as offers and advertisements which may ultimately lead to a completed sale. Moreover, the extension of the word "sale" to include offers is quite incompatible with Congress' separate definition and use of these terms in the 1933 and 1934 Acts. Cf. § 2 (3) of the 1933 Act, 15 U. S. C. § 77b (3). Beyond this, the wording of § 10 (b), making fraud *in connection with the purchase or sale of a security* a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large.

[6] Section 17 (a) of the 1933 Act provides in wording virtually identical to that of Rule 10b–5 with the exception of the italicized portion that:

"It shall be unlawful for any person *in the offer* or sale of any securities by the use of any means or instruments of transportation

"in the offer or sale" of securities. Cf. § 5 of the 1933 Act, 15 U. S. C. § 77e. When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly. Cf. § 16 (b) of the 1934 Act, 15 U. S. C. § 78p (b).

Section 28 (a) of the 1934 Act, 15 U. S. C. § 78bb (a), which limits recovery in any private damages action brought under the 1934 Act to "actual damages," likewise provides some support for the purchaser-seller rule. See, e. g., Bromberg § 8.8, p. 221. While the damages suffered by purchasers and sellers pursuing a § 10 (b) cause of action may on occasion be difficult to ascertain, *Affiliated Ute Citizens* v. *United States,* 406 U. S., at 155, in the main such purchasers and sellers at least seek to base recovery on a demonstrable number of shares traded. In contrast, a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a

---

or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." (Emphasis added.)

We express, of course, no opinion on whether § 17 (a) in light of the express civil remedies of the 1933 Act gives rise to an implied cause of action. Compare *Greater Iowa Corp.* v. *McLendon,* 378 F. 2d 783, 788–791 (CA8 1967), with *Fischman* v. *Raytheon Mfg. Co.,* 188 F. 2d 783, 787 (CA2 1951). See, e. g., *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833, 867 (CA2 1968) (Friendly, J., concurring), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969); 3 L. Loss, Securities Regulation 1785 (2d ed. 1961).

largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis. Cf. *Estate Counseling Service, Inc.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F. 2d 527, 533 (CA10 1962); *Levine* v. *Seilon, Inc.,* 439 F. 2d 328, 335 (CA2 1971); *Wolf* v. *Frank,* 477 F. 2d 467, 478 (CA5 1973).

One of the justifications advanced for implication of a cause of action under § 10 (b) lies in § 29 (b) of the 1934 Act, 15 U. S. C. § 78cc (b), providing that a contract made in violation of any provision of the 1934 Act is voidable at the option of the deceived party.[7] See, *e. g., Kardon* v. *National Gypsum Co.,* 69 F. Supp., at 514; *Slavin* v. *Germantown Fire Insurance Co.,* 174 F. 2d 799, 815 (CA3 1949); *Fischman* v. *Raytheon Mfg. Co.,* 188 F. 2d 783, 787 n. 4 (CA2 1951); Bromberg § 2.4.(1)(b). But that justification is absent when there is no actual purchase or sale of securities, or a contract to purchase or sell, affected or tainted by a violation of § 10 (b). Cf. *Mount Clemens Industries, Inc.* v. *Bell, supra.*

The principal express nonderivative private civil reme-

---

[7] Section 29 (b) of the 1934 Act provides in part:

"Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ."

Cf. *Deckert* v. *Independence Shares Corp.,* 311 U. S. 282 (1940).

dies, created by Congress contemporaneously with the passage of § 10 (b), for violations of various provisions of the 1933 and 1934 Acts are by their terms expressly limited to purchasers or sellers of securities. Thus § 11 (a) of the 1933 Act confines the cause of action it grants to "any person acquiring such security" while the remedy granted by § 12 of that Act is limited to the "person purchasing such security." Section 9 of the 1934 Act, prohibiting a variety of fraudulent and manipulative devices, limits the express civil remedy provided for its violation to "any person who shall purchase or sell any security" in a transaction affected by a violation of the provision. Section 18 of the 1934 Act, prohibiting false or misleading statements in reports or other documents required to be filed by the 1934 Act, limits the express remedy provided for its violation to "any person . . . who . . . shall have purchased or sold a security at a price which was affected by such statement . . . ." It would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action.[8]

---

[8] MR. JUSTICE BLACKMUN, dissenting, *post*, at 762, finds the *Birnbaum* rule incompatible with the purpose and history of § 10 (b) and Rule 10b–5. But it is worthy of more than passing note that the history of Rule 10b–5 itself, recounted at some length in the dissent, *post*, at 766–767, strongly supports the purchaser-seller limitation. As the dissent notes, Rule 10b–5 was adopted in order to close "a loophole in the protections against fraud . . . by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase." See SEC Release No. 3230 (May 21, 1942); remarks of Milton Freeman, Conference on Codification of the Federal Securities Laws, 22 Bus. Law. 793, 922 (1967). The modest aims and origins of the Rule as recounted by the dissent stand in stark contrast with its far-ranging conclusion that a remedy exists under Rule 10b–5 whenever there is "a logical nexus between the alleged fraud and the sale or purchase of a security." *Post*, at

Having said all this, we would by no means be understood as suggesting that we are able to divine from the language of § 10 (b) the express "intent of Congress" as to the contours of a private cause of action under Rule 10b–5. When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn. Such growth may be quite consistent with the congressional enactment and with the role of the federal judiciary in interpreting it. see *J. I. Case Co.* v. *Borak, supra*, but it would be disingenuous to suggest that either Congress in 1934 or the Securities and Exchange Commission in 1942 foreordained the present state of the law with respect to Rule 10b–5. It is therefore proper that we consider, in addition to the factors already discussed, what may be described as policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance.

Three principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule. First are potential purchasers of shares, either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an

770    On these facts, as we have indicated, *infra*, at 752–754, extension of a Rule 10b–5 cause of action, far from closing an unforeseen loophole, would extend a private right of action for misrepresentations in a 1933 Act prospectus to those whom Congress excluded from the express civil remedies provided in the 1933 Act to cover such a violation.

unduly rosy representation or a failure to disclose unfavorable material. Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5. It has been held that shareholder members of the second and third of these classes may frequently be able to circumvent the *Birnbaum* limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities. See, *e. g.*, *Schoenbaum* v. *Firstbrook*, 405 F. 2d 215, 219 (CA2 1968), cert. denied *sub nom. Manley* v. *Schoenbaum*, 395 U. S. 906 (1969). But the first of these classes, of which respondent is a member, cannot claim the benefit of such a rule.

A great majority of the many commentators on the issue before us have taken the view that the *Birnbaum* limitation on the plaintiff class in a Rule 10b–5 action for damages is an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b–5. See, *e. g.*, Lowenfels, The Demise of the *Birnbaum* Doctrine: A New Era for Rule 10b–5, 54 Va. L. Rev. 268 (1968). The Securities and Exchange Commission has filed an *amicus* brief in this case espousing that same view. We have no doubt that this is indeed a disadvantage of the *Birnbaum* rule,[9] and if it

---

[9] Obviously this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law. Cf. § 28 of the 1934 Act, 15 U. S. C. § 78bb. See *Iroquois Industries, Inc.* v. *Syracuse China Corp.*, 417 F. 2d 963, 969 (CA2 1969), cert. denied, 399 U. S. 909 (1970). Thus, for example, in *Birnbaum* itself, while the plaintiffs found themselves without federal remedies, the conduct alleged as the gravamen of the federal complaint later provided the basis for recovery in a cause of action based on state law. See 3 L. Loss, Securities Regulation 1469 (2d

had no countervailing advantages it would be undesirable as a matter of policy, however much it might be supported by precedent and legislative history. But we are of the opinion that there are countervailing advantages to the *Birnbaum* rule, purely as a matter of policy, although those advantages are more difficult to articulate than is the disadvantage.

There has been widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general. This fact was recognized by Judge Browning in his opinion for the majority of the Court of Appeals in this case, 492 F. 2d, at 141, and by Judge Hufstedler in her dissenting opinion when she said:

> "The purchaser-seller rule has maintained the balances built into the congressional scheme by permitting damage actions to be brought only by those persons whose active participation in the marketing transaction promises enforcement of the statute without undue risk of abuse of the litigation process and without distorting the securities market." *Id.*, at 147.

Judge Friendly in commenting on another aspect of Rule 10b–5 litigation has referred to the possibility that unduly expansive imposition of civil liability "will lead to large judgments, payable in the last analysis by innocent investors, for the benefit of speculators and their lawyers . . . ." *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 867 (CA2 1968) (concurring opinion). See also

---

ed. 1961). And in the immediate case, respondent has filed a state-court class action held in abeyance pending the outcome of this suit. *Manor Drug Stores* v. *Blue Chip Stamps,* No. C–5652 (Superior Court, County of Los Angeles, Cal.)

Boone & McGowan, Standing to Sue under SEC Rule 10b–5, 49 Tex. L. Rev. 617, 648–649 (1971).

We believe that the concern expressed for the danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b–5 is founded in something more substantial than the common complaint of the many defendants who would prefer avoiding lawsuits entirely to either settling them or trying them. These concerns have two largely separate grounds.

The first of these concerns is that in the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment. The very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit. See, *e. g.,* Sargent, The SEC and the Individual Investor: Restoring His Confidence in the Market, 60 Va. L. Rev. 553, 562–572 (1974); Dooley, The Effects of Civil Liability on Investment Banking and the New Issues Market, 58 Va. L. Rev. 776, 822–843 (1972).

Congress itself recognized the potential for nuisance or "strike" suits in this type of litigation, and in Title II of the 1934 Act amended § 11 of the 1933 Act to provide that:

> "In any suit under this or any other section of this title the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees . . . ." § 206 (d), 48 Stat. 881, 908.

Senator Fletcher, Chairman of the Senate Banking and Finance Committee, in introducing Title II of the 1934

Act on the floor of the Senate, stated in explaining the amendment to § 11 (e): "This amendment is the most important of all." 78 Cong. Rec. 8669. Among its purposes was to provide "a defense against blackmail suits." *Ibid.*

Where Congress in those sections of the 1933 Act which expressly conferred a private cause of action for damages, adopted a provision uniformly regarded as designed to deter "strike" or nuisance actions, *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541, 548–549 (1949), that fact alone justifies our consideration of such potential in determining the limits of the class of plaintiffs who may sue in an action wholly implied from the language of the 1934 Act.

The potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure may likewise exist in this type of case to a greater extent than they do in other litigation. The prospect of extensive deposition of the defendant's officers and associates and the concomitant opportunity for extensive discovery of business documents, is a common occurrence in this and similar types of litigation. To the extent that this process eventually produces relevant evidence which is useful in determining the merits of the claims asserted by the parties, it bears the imprimatur of those Rules and of the many cases liberally interpreting them. But to the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit. Yet to broadly expand the class of plaintiffs who may sue under Rule 10b–5 would appear to encourage the least appealing aspect of the use of the discovery rules.

Without the *Birnbaum* rule, an action under Rule 10b–5 will turn largely on which oral version of a series of occurrences the jury may decide to credit, and therefore no matter how improbable the allegations of the plaintiff, the case will be virtually impossible to dispose of prior to trial other than by settlement. In the words of Judge Hufstedler's dissenting opinion in the Court of Appeals:

> "The great ease with which plaintiffs can allege the requirements for the majority's standing rule and the greater difficulty that plaintiffs are going to have proving the allegations suggests that the majority's rule will allow a relatively high proportion of 'bad' cases into court. The risk of strike suits is particularly high in such cases; although they are difficult to prove at trial, they are even more difficult to dispose of before trial." 492 F. 2d, at 147 n. 9.

The *Birnbaum* rule, on the other hand, permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question. The fact of purchase of stock and the fact of sale of stock are generally matters which are verifiable by documentation, and do not depend upon oral recollection, so that failure to qualify under the *Birnbaum* rule is a matter that can normally be established by the defendant either on a motion to dismiss or on a motion for summary judgment.

Obviously there is no general legal principle that courts in fashioning substantive law should do so in a manner which makes it easier, rather than more difficult, for a defendant to obtain a summary judgment. But in this type of litigation, where the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, an entirely legitimate component of settlement value, but because of the threat of extensive dis-

covery and disruption of normal business activities which may accompany a lawsuit which is groundless in any event, but cannot be proved so before trial, such a factor is not to be totally dismissed. The *Birnbaum* rule undoubtedly excludes plaintiffs who have in fact been damaged by violations of Rule 10b–5, and to that extent it is undesirable. But it also separates in a readily demonstrable manner the group of plaintiffs who actually purchased or actually sold, and whose version of the facts is therefore more likely to be believed by the trier of fact, from the vastly larger world of potential plaintiffs who might successfully allege a claim but could seldom succeed in proving it. And this fact is one of its advantages.

The second ground for fear of vexatious litigation is based on the concern that, given the generalized contours of liability, the abolition of the *Birnbaum* rule would throw open to the trier of fact many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony. We in no way disparage the worth and frequent high value of oral testimony when we say that dangers of its abuse appear to exist in this type of action to a peculiarly high degree. The Securities and Exchange Commission, while opposing the adoption of the *Birnbaum* rule by this Court, states that it agrees with petitioners "that the effect, if any, of a deceptive practice on someone who has neither purchased nor sold securities may be more difficult to demonstrate than is the effect on a purchaser or seller." Brief for the Securities and Exchange Commission as *Amicus Curiae* 24–25. The brief also points out that frivolous suits can be brought whatever the rules of standing, and reminds us of this Court's recognition "in a different context" that "the expense and annoyance of litigation is 'part of the social burden of living under

government.' "  *Id.,* at 24 n. 30.  See *Petroleum Exploration, Inc.* v. *Public Service Comm'n,* 304 U. S. 209, 222 (1938).  The Commission suggests that in particular cases additional requirements of corroboration of testimony and more limited measure of damages would correct the dangers of an expanded class of plaintiffs.

But the very necessity, or at least the desirability, of fashioning unique rules of corroboration and damages as a correlative to the abolition of the *Birnbaum* rule suggests that the rule itself may have something to be said for it.

In considering the policy underlying the *Birnbaum* rule, it is not inappropriate to advert briefly to the tort of misrepresentation and deceit, to which a claim under Rule 10b–5 certainly has some relationship.  Originally under the common law of England such an action was not available to one other than a party to a business transaction.  That limitation was eliminated in *Pasley* v. *Freeman,* 3 T. R. 51, 100 Eng. Rep. 450 (1789).  Under the earlier law the misrepresentation was generally required to be one of fact, rather than opinion, but that requirement, too, was gradually relaxed.  Lord Bowen's famous comment in *Edgington* v. *Fitzmaurice,* [1882] L. R. 29 Ch. Div. 459, 483, that "the state of a man's mind is as much a fact as the state of his digestion," suggests that this distinction, too, may have been somewhat arbitrary.  And it has long been established in the ordinary case of deceit that a misrepresentation which leads to a refusal to purchase or to sell is actionable in just the same way as a misrepresentation which leads to the consummation of a purchase or sale.  *Butler* v. *Watkins,* 13 Wall. 456 (1872).  These aspects of the evolution of the tort of deceit and misrepresentation suggest a direction away from rules such as *Birnbaum.*

But the typical fact situation in which the classic tort

of misrepresentation and deceit evolved was light years away from the world of commercial transactions to which Rule 10b–5 is applicable. The plaintiff in *Butler, supra,* for example, claimed that he had held off the market a patented machine for tying cotton bales which he had developed by reason of the fraudulent representations of the defendant. But the report of the case leaves no doubt that the plaintiff and defendant met with one another in New Orleans, that one presented a draft agreement to the other, and that letters were exchanged relating to that agreement. Although the claim to damages was based on an allegedly fraudulently induced decision not to put the machines on the market, the plaintiff and the defendant had concededly been engaged in the course of business dealings with one another, and would presumably have recognized one another on the street had they met.

In today's universe of transactions governed by the 1934 Act, privity of dealing or even personal contact between potential defendant and potential plaintiff is the exception and not the rule. The stock of issuers is listed on financial exchanges utilized by tens of millions of investors, and corporate representations reach a potential audience, encompassing not only the diligent few who peruse filed corporate reports or the sizable number of subscribers to financial journals, but the readership of the Nation's daily newspapers. Obviously neither the fact that issuers or other potential defendants under Rule 10b–5 reach a large number of potential investors, or the fact that they are required by law to make their disclosures conform to certain standards, should in any way absolve them from liability for misconduct which is proscribed by Rule 10b–5.

But in the absence of the *Birnbaum* rule, it would be sufficient for a plaintiff to prove that he had failed to

purchase or sell stock by reason of a defendant's violation of Rule 10b–5. The manner in which the defendant's violation caused the plaintiff to fail to act could be as a result of the reading of a prospectus, as respondent claims here, but it could just as easily come as a result of a claimed reading of information contained in the financial pages of a local newspaper. Plaintiff's proof would not be that he purchased or sold stock, a fact which would be capable of documentary verification in most situations, but instead that he decided *not* to purchase or sell stock. Plaintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of his claim, and still be sufficient to go to the jury. The jury would not even have the benefit of weighing the plaintiff's version against the defendant's version, since the elements to which the plaintiff would testify would be in many cases totally unknown and unknowable to the defendant. The very real risk in permitting those in respondent's position to sue under Rule 10b–5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him.[10]

---

[10] The SEC, recognizing the necessity for limitations on nonpurchaser, nonseller plaintiffs in the absence of the *Birnbaum* rule, suggests two such limitations to mitigate the practical adverse effects flowing from abolition of the rule. First, it suggests requiring some corroborative evidence in addition to oral testimony tending to show that the investment decision of a plaintiff was affected by an omission or misrepresentation. Brief for the Securities and Exchange Commission as *Amicus Curiae* 25–26. Apparently ownership of stock or receipt of a prospectus or press release would be sufficient corroborative evidence in the view of the SEC to reach the jury. We do not believe that such a requirement would adequately respond to the concerns in part underlying the *Birnbaum* rule. Ownership of stock or receipt of a prospectus says little about

The virtue of the *Birnbaum* rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates. And their dealing in the security, whether by way of purchase or sale, will generally be an objectively demonstrable fact in an area of the law otherwise very much dependent upon oral testimony. In the absence of the *Birnbaum* doctrine, bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market and that unduly pessimistic predictions by the issuer followed by a rising market caused them to allow retrospectively golden opportunities to pass.

While much of the development of the law of deceit has been the elimination of artificial barriers to recovery on just claims, we are not the first court to express concern that the inexorable broadening of the class of plain-

whether a plaintiff's investment decision was affected by a violation of Rule 10b–5 or whether a decision was even made. Second, the SEC would limit the vicarious liability of corporate issuers to nonpurchasers and nonsellers to situations where the corporate issuer has been unjustly enriched by a violation. We have no occasion to pass upon the compatibility of this limitation with § 20 (a) of the 1934 Act, 15 U. S. C. § 78t (a). We do not believe that this proposed limitation is relevant to the concerns underlying in part the *Birnbaum* rule as we have expressed them. We are not alone in feeling that the limitations proposed by the SEC are not adequate to deal with the adverse effects which would flow from abolition of the *Birnbaum* rule. See, *e. g.*, *Vine* v. *Beneficial Finance Co.*, 374 F. 2d 627, 636 (CA2), cert. denied, 389 U. S. 970 (1967); *Iroquois Industries, Inc.* v. *Syracuse China Corp.*, 417 F. 2d, at 967; *Rekant* v. *Desser*, 425 F. 2d 872, 879 (CA5 1970); *GAF Corp.* v. *Milstein*, 453 F. 2d 709, 721 (CA2 1971), cert. denied, 406 U. S. 910 (1972); *Drachman* v. *Harvey*, 453 F. 2d 722, 736, 738 (CA2 1972) (en banc); *Mount Clemens Industries, Inc.* v. *Bell*, 464 F. 2d 339, 341 (CA9 1972).

tiff who may sue in this area of the law will ultimately result in more harm than good. In *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 174 N. E. 441 (1931), Chief Judge Cardozo observed with respect to "a liability in an indeterminate amount for an indeterminate time to an indeterminate class":

> "The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences." *Id.,* at 179–180, 174 N. E., at 444.

In *Herpich* v. *Wallace,* 430 F. 2d 792, 804–805 (CA5 1970), a case adopting the *Birnbaum* limitation on the class of plaintiffs who might bring an action for damages based on a violation of Rule 10b–5, Judge Ainsworth expressed concern similar to that expressed by Chief Judge Cardozo. Judge Stevens, writing in *Eason* v. *General Motors Acceptance Corp.,* 490 F. 2d, at 660, stated that court's view that these concerns were unduly emphasized, and went on to say that "we may not for that reason reject what we believe to be a correct interpretation of the statute or the rule." He relied in part on the view that Rule 10b–5 should be interpreted, in keeping with this Court's repeated admonition, " 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *Affiliated Ute Citizens* v. *United States,* 406 U. S., at 151.

We quite agree that if Congress had legislated the elements of a private cause of action for damages, the duty of the Judicial Branch would be to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability. But as we have pointed out, we are not dealing here with

any private right created by the express language of
§ 10 (b) or of Rule 10b–5. No language in either
of those provisions speaks at all to the contours
of a private cause of action for their violation.
However flexibly we may construe the language of both
provisions, nothing in such construction militates against
the *Birnbaum* rule. We are dealing with a private cause
of action which has been judicially found to exist, and
which will have to be judicially delimited one way or
another unless and until Congress addresses the ques-
tion. Given the peculiar blend of legislative, adminis-
trative, and judicial history which now surrounds Rule
10b–5, we believe that practical factors to which we have
adverted, and to which other courts have referred, are
entitled to a good deal of weight.

Thus we conclude that what may be called considera-
tions of policy, which we are free to weigh in deciding
this case, are by no means entirely on one side of the
scale. Taken together with the precedential support for
the *Birnbaum* rule over a period of more than 20 years,
and the consistency of that rule with what we can glean
from the intent of Congress, they lead us to conclude
that it is a sound rule and should be followed.

## IV

The majority of the Court of Appeals in this case
expressed no disagreement with the general proposition
that one asserting a claim for damages based on the vio-
lation of Rule 10b–5 must be either a purchaser or seller
of securities. However, it noted that prior cases have
held that persons owning contractual rights to buy or
sell securities are not excluded by the *Birnbaum* rule.
Relying on these cases, it concluded that respond-
ent's status as an offeree pursuant to the terms of the
consent decree served the same function, for purposes

of delimiting the class of plaintiffs, as is normally performed by the requirement of a contractual relationship. 492 F. 2d, at 142.

The Court of Appeals recognized, and respondent concedes here,[11] that a well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it. *United States* v. *Armour & Co.,* 402 U. S. 673 (1971); *Buckeye Co.* v. *Hocking Valley Co.,* 269 U. S. 42 (1925).[12]

A contract to purchase or sell securities is expressly defined by § 3 (a) of the 1934 Act, 15 U. S. C. § 78c (a),[13]

---

[11] See Brief for Respondent 60.

[12] See n. 1, *supra;* 492 F. 2d, at 144 n. 3 (Hufstedler, J., dissenting).

[13] Section 3 (a)(13) of the 1934 Act, 15 U. S. C. § 78c (a)(13), provides:

"The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."

Section 3 (a)(14) of the 1934 Act, 15 U. S. C. § 78c (a)(14), provides:

"The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

These provisions as enacted starkly contrast with the wording of the bill which became the 1934 Act when it emerged from committee and was presented on the Senate floor by Senator Fletcher, the chairman of the Senate Committee on Banking and Finance. See S. 2693, 73d Cong., 2d Sess. (1934). Section 3 (11) of the bill as presented to the Senate provided:

"The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire, contract of purchase, *attempt or offer to acquire or solicitation of an offer to sell a security or any interest in a security."* (Emphasis added.)

And § 3 (12) of the bill provided:

"The terms 'sale' and 'sell' each include any contract of sale or disposition of, contract to sell or dispose of, *attempt or offer to*

as a purchase or sale of securities for the purposes of that Act. Unlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b–5, not because of a judicial conclusion that they were similarly situated to "purchasers" or "sellers," but because the definitional provisions of the 1934 Act themselves grant them such a status.

Even if we were to accept the notion that the *Birnbaum* rule could be circumvented on a case-by-case basis through particularized judicial inquiry into the facts surrounding a complaint, this respondent and the members of its alleged class would be unlikely candidates for such a judicially created exception. While the *Birnbaum* rule has been flexibly interpreted by lower federal courts,[14] we have been unable to locate a single decided case from any court in the 20-odd years of litigation since the *Birnbaum* decision which would support the right of persons who were in the position of respondent here to bring a private suit under Rule 10b–5. Respondent was not only not a buyer or seller of any security

---

*dispose of, or solicitation of an offer to buy a security or any interest therein.*" (Emphasis added.)

During consideration of the bill on the Senate floor, the ambit of these provisions was narrowed through amendment into the present wording of §§ 3 (a) (13) and (14). 48 Stat. 884. In arguing that it, as an offeree of stock, ought to be treated as a purchaser or seller for purposes of the Act, respondent is in effect seeking a judicial reinsertion of language into the Act that Congress had before it but deleted prior to passage.

[14] Our decision in *SEC* v. *National Securities, Inc.*, 393 U. S. 453 (1969), established that the purchaser-seller rule imposes no limitation on the standing of the SEC to bring actions for injunctive relief under § 10 (b) and Rule 10b–5.

but it was not even a shareholder of the corporate petitioners.

As indicated, the 1934 Act, under which respondent seeks to assert a cause of action, is general in scope but chiefly concerned with the regulation of post-distribution trading on the Nation's stock exchanges and securities trading markets. The 1933 Act is a far narrower statute chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily, as here, initial distributions of newly issued stock from corporate issuers. 1 L. Loss, Securities Regulation 130–131 (2d ed. 1961). Respondent, who derives no entitlement from the antitrust consent decree and does not otherwise possess any contractual rights relating to the offered stock, stands in the same position as any other disappointed offeree of a stock offering registered under the 1933 Act who claims that an overly pessimistic prospectus, prepared and distributed as required by §§ 5 and 10 of the 1933 Act, has caused it to allow its opportunity to purchase to pass.

There is strong evidence that application of the *Birnbaum* rule to preclude suit by the disappointed offeree of a registered 1933 Act offering under Rule 10b–5 furthers the intention of Congress as expressed in the 1933 Act.[15] Congress left little doubt that its purpose in imposing the prospectus and registration requirements of the 1933 Act was to prevent the "[h]igh pressure salesmanship rather than careful counsel," causing inflated

---

[15] Blue Chip did not here present the question of whether an implied action under § 10 (b) of the 1934 Act and Rule 10b–5 will lie for actions made a violation of the 1933 Act and the subject of express civil remedies under the 1933 Act. We therefore have no occasion to pass on this issue. Compare *Rosenberg* v. *Globe Aircraft Corp.*, 80 F. Supp. 123 (ED Pa. 1948), with *Thiele* v. *Shields*, 131 F. Supp. 416 (SDNY 1955). Cf. 3 L. Loss, Securities Regulation 1787–1791 (2d ed. 1961); 6 L. Loss, Securities Regulation 3915–3917 (1969); Bromberg § 2.4 (2).

new issues, through direct limitation by the SEC of "the selling arguments hitherto employed." H. R. Rep. No. 85, 73d Cong., 1st Sess., 2, 8 (1933).

> "Any objection that the compulsory incorporation in selling literature and sales argument of substantially all information concerning the issue, will frighten the buyer with the intricacy of the transaction, states one of the best arguments for the provision." *Id.*, at 8.

The SEC, in accord with the congressional purposes, specifically requires prominent emphasis be given in filed registration statements and prospectuses to material adverse contingencies. See, *e. g.*, SEC Securities Act Release No. 4936, Guides for the Preparation and Filing of Registration Statements 6, ¶ 6 (1968); *In re Universal Camera Corp.*, 19 S. E. C. 648, 654–656 (1945); Wheat & Blackstone, Guideposts for a First Public Offering, 15 Bus. Law. 539, 560–562 (1960).

Sections 11 and 12 of the 1933 Act provide express civil remedies for misrepresentations and omissions in registration statements and prospectuses filed under the Act, as here charged, but restrict recovery to the offering price of shares actually purchased:

> "To impose a greater responsibility, apart from constitutional doubts, would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public." H. R. Rep. No. 85, *supra*, at 9.

And in Title II of the 1934 Act, 48 Stat. 905–908, the same Act adopting § 10 (b), Congress amended § 11 of the 1933 Act to limit still further the express civil remedy it conferred. See generally James, Amendments to the Securities Act of 1933, 32 Mich. L. Rev. 1130, 1134 (1934). The additional congressional restrictions,

contained in Title II of the 1934 Act, on the already limited express civil remedies provided by the 1933 Act for misrepresentations or omissions in a registration statement or prospectus reflected congressional concern over the impact of even these limited remedies on the new issues market. 78 Cong. Rec. 8668–8669 (1934). There is thus ample evidence that Congress did not intend to extend a private cause of action for money damages to the nonpurchasing offeree of a stock offering registered under the 1933 Act for loss of the opportunity to purchase due to an overly pessimistic prospectus.

Beyond the difficulties evident in an extension of standing to this respondent, we do not believe that the *Birnbaum* rule is merely a shorthand judgment on the nature of a particular plaintiff's proof. As a purely practical matter, it is doubtless true that respondent and the members of its class, as offerees and recipients of the prospectus of New Blue Chip, are a smaller class of potential plaintiffs than would be all those who might conceivably assert that they obtained information violative of Rule 10b–5 and attributable to the issuer in the financial pages of their local newspaper. And since respondent likewise had a prior connection with some of petitioners as a result of using the trading stamps marketed by Old Blue Chip, and was intended to benefit from the provisions of the consent decree, there is doubtless more likelihood that its managers read and were damaged by the allegedly misleading statements in the prospectus than there would be in a case filed by a complete stranger to the corporation.

But respondent and the members of its class are neither "purchasers" nor "sellers," as those terms are defined in the 1934 Act, and therefore to the extent that their claim of standing to sue were recognized, it would mean that the lesser practical difficulties of corroborating

at least some elements of their proof would be regarded as sufficient to avoid the *Birnbaum* rule. While we have noted that these practical difficulties, particularly in the case of a complete stranger to the corporation, support the retention of that rule, they are by no means the only factor which does so. The general adoption of the rule by other federal courts in the 25 years since it was announced, and the consistency of the rule with the statutes involved and their legislative history, are likewise bases for retaining the rule. Were we to agree with the Court of Appeals in this case, we would leave the *Birnbaum* rule open to endless case-by-case erosion depending on whether a particular group of plaintiffs was thought by the court in which the issue was being litigated to be sufficiently more discrete than the world of potential purchasers at large to justify an exception. We do not believe that such a shifting and highly fact-oriented disposition of the issue of who may bring a damages claim for violation of Rule 10b–5 is a satisfactory basis for a rule of liability imposed on the conduct of business transactions. Nor is it as consistent as a straightforward application of the *Birnbaum* rule with the other factors which support the retention of that rule. We therefore hold that respondent was not entitled to sue for violation of Rule 10b–5, and the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, concurring.

Although I join the opinion of the Court, I write to emphasize the significance of the texts of the Acts of 1933 and 1934 and especially the language of § 10 (b) and Rule 10b–5.

## I

The starting point in every case involving construction of a statute is the language itself. The critical phrase in both the statute and the Rule is "in connection with the *purchase* or *sale* of any security." 15 U. S. C. § 78j (b); 17 CFR § 240.10b–5 (1975) (emphasis added). Section 3 (a)(14) of the 1934 Act, 15 U. S. C. § 78c (a) (14), provides that the term "sale" shall "include any contract to sell or otherwise dispose of" securities. There is no hint in any provision of the Act that the term "sale," as used in § 10 (b), was intended—in addition to its long-established legal meaning—to include an "offer to sell." Respondent, nevertheless, would have us amend the controlling language in § 10 (b) to read:

"in connection with the purchase or sale of, or an offer to sell, any security."

Before a court properly could consider taking such liberty with statutory language there should be, at least, unmistakable support in the history and structure of the legislation. None exists in this case.

Nothing in the history of the 1933 and 1934 Acts supports any congressional intent to include mere offers in § 10 (b). Moreover, as the Court's opinion indicates, impressive evidence in the texts of the two Acts demonstrates clearly that Congress selectively and carefully distinguished between offers, purchases, and sales. For example, § 17 (a), the antifraud provision of the 1933 Act, 15 U. S. C. § 77q (a), expressly includes "offer[s]" of securities within its terms while § 10 (b) of the 1934 Act and Rule 10b–5 do not. The 1933 Act also defines "offer to sell" as something distinct from a sale. § 2 (3), 15 U. S. C. § 77b (3).

If further evidence of congressional intent were needed, it may be found in the subsequent history of these Acts.

As noted in the Court's opinion, the Securities and Exchange Commission unsuccessfully sought, in 1957 and again in 1959, to persuade Congress to broaden § 10 (b) by adding to the critical language: "or any attempt to purchase or sell" any security. See *ante,* at 732.

This case involves no "purchase or sale" of securities.[1] Respondent was a mere offeree, which instituted this suit some two years after the shares were issued and after the market price had soared. Having "missed the market" on a stock, it is hardly in a unique position. The capital that fuels our enterprise system comes from investors who have frequent opportunities to purchase, or not to purchase, securities being offered publicly. The market prices of new issues rarely remain static: almost invariably they go up or down, and they often fluctuate widely over a period far less than the two years during which respondent reflected on its lost opportunity. Most investors have unhappy memories of decisions not to buy stocks which later performed well.

The opinion of the Court, and the dissenting opinion of Judge Hufstedler in the Court of Appeals, correctly emphasize the subjective nature of the inevitable inquiry if the term "offer" were read into the Act and some arguable error could be found in an offering prospectus: "Would I have purchased this particular security at the time it was offered if I had known the correct facts?" Apart from the human temptation for the plaintiff to answer this question in a self-serving fashion, the offeror

---

[1] It is argued that the language "in connection with" justifies extending § 10 (b) to include offers which necessarily precede a purchase or sale. The short answer is that the statute requires a purchase or a sale of a security, and no offer was made to respondent in connection with either. Its complaint rests upon the *absence* of a sale to or purchase by it.

of the securities—defendant in the suit—is severely handicapped in challenging the predictable testimony.[2] The subjective issues would be even more speculative in the class actions that inevitably would follow if we held that offers to sell securities are covered by § 10 (b) and Rule 10b–5.

In this case respondent was clearly identifiable as an offeree, as here the shares were offered to designated persons.[3] In the more customary public sale of securities, identification of those who in fact were bona fide offerees would present severe problems of proof. The 1933 Act requires that offers to sell registered securities be made by means of an effective prospectus. § 5 (b), 15 U. S. C. § 77e (b). Issues are usually marketed through underwriters and dealers, often including scores of investment banking and brokerage firms across the country. Copies of the prospectus may be widely distributed through the dealer group, and then passed hand to hand among countless persons whose identities cannot be known. If § 10 (b) were extended to embrace offers to sell, the number of persons claiming to have been

---

[2] Proving, after the fact, what "one would have done" encompasses a number of conjectural as well as subjective issues: would the offeree have bought at all; how many shares would he have bought; how long would he have held the shares; were there other "buys" on the market at the time that may have been more attractive even had the offeree known the facts; did he in fact use his available funds (if any) more advantageously by purchasing something else?

[3] It is argued that the special facts of this case justify extending the benefit of § 10 (b) to this respondent, even if the statute ordinarily requires a purchase or a sale. But this resolution also would require judicial extension of the terms of the statute. The mere fact that securities are offered to a limited class of offerees may eliminate some of the problems of proof but it does not avoid the fatal objection that no offer of securities, absent a purchase or sale, is covered by the statute.

offerees could be legion with respect to any security that subsequently proved to be a rewarding investment.

We are entitled to assume that the Congress, in enacting § 10 (b) and in subsequently declining to extend it, took into account these and similar considerations. The courts already have inferred a private cause of action that was not authorized by the legislation. In doing this, however, it was unnecessary to rewrite the precise language of § 10 (b) and Rule 10b–5. This is exactly what respondent—joined, surprisingly, by the SEC— sought in this case.[4] If such a far-reaching change is to

---

[4] It is more than curious that the SEC should seek this change in the 1934 Act by judicial action. The stated purpose of the 1933 Act was "[t]o provide full and fair disclosure of the character of securities sold in interstate and foreign commerce . . . ." See preamble to Act, 48 Stat. 74. The evil addressed was the tendency of the seller to exaggerate, to "puff," and sometimes fraudulently to overstate the prospects and earning capabilities of the issuing corporation. The decade of the 1920's was marked by financings in which the buying public was oversold, and often misled, by the buoyant optimism of issuers and underwriters. The 1933 Act was intended to. compel moderation and caution in prospectuses, and this is precisely the way that Act has been administered by the SEC for more than 40 years. Precise factual accuracy with respect to a corporate enterprise is frequently impossible, except with respect to hard facts. The outcome of pending litigation, the effect of relatively new legislation, the possible enactment of adverse legislation, the cost of projected construction or of entering new markets, the expenditures needed to meet changing environmental regulations, the likelihood and effect of new competition or of new technology, and many similar matters of potential relevancy must be addressed in registration statements and prospectuses. In administering the 1933 Act, the SEC traditionally and consistently has encouraged and often required offerors to take conservative postures in prospectuses, especially with respect to judgmental and possibly unfavorable matters. If a different philosophy now were to be read into the 1934 Act, inviting litigation for arguably misleading understatement as well as for overstatement of the issuer's prospects, the hazard of

be made, with unpredictable consequences for the process of raising capital so necessary to our economic well-being, it is a matter for the Congress, not the courts.

## II

Mr. Justice Blackmun's dissent charges the Court with "a preternatural solicitousness for corporate well-being and a seeming callousness toward the investing public." Our task in this case is to construe a statute. In my view, the answer is plainly compelled by the language as well as the legislative history of the 1933 and 1934 Acts. But even if the language is not "plain" to all, I would have thought none could doubt that the statute can be read fairly to support the result the Court reaches. Indeed, if one takes a different view—and imputes callousness to all who disagree—he must attribute a lack of legal and social perception to the scores of federal judges who have followed *Birnbaum* for two decades.

The dissenting opinion also charges the Court with paying "no heed to the unremedied wrong" arising from the type of "fraud" that may result from reaffirmance of the *Birnbaum* rule. If an issue of statutory construction is to be decided on the basis of assuring a *federal* remedy—in addition to state remedies—for every perceived fraud, at least we should strike a balance between the opportunities for fraud presented by the contending views. It may well be conceded that *Birnbaum* does allow some fraud to go unremedied under the federal securities Acts. But the construction advocated by the dissent could result in wider opportunities for fraud. As the Court's opinion makes plain, abandoning the *Birnbaum* construction in favor of the rule urged by the dissent would invite any person who failed to purchase a

---

"going to market"—already not inconsequential—would be immeasurably increased.

newly offered security that subsequently enjoyed sub-stantial market appreciation to file a claim alleging that the offering prospectus understated the company's potential. The number of possible plaintiffs with respect to a public offering would be virtually unlimited. As noted above (at 758 n. 2), an honest offeror could be confronted with subjective claims by plaintiffs who had neither purchased its securities nor seriously considered the investment. It frequently would be impossible to refute a plaintiff's assertion that he relied on the prospectus, or even that he made a decision not to buy the offered securities. A rule allowing this type of open-ended litigation would itself be an invitation to fraud.[5]

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

Today the Court graves into stone *Birnbaum*'s[1] arbitrary principle of standing. For this task the Court, unfortunately, chooses to utilize three blunt chisels: (1) reliance on the legislative history of the 1933 and

---

[5] The dissent also charges that we are callous toward the "investing public"—a term it does not define. It would have been more accurate, perhaps, to have spoken of the noninvesting public, because the Court's decision does not abandon the investing public. The great majority of registered issues of securities are offered by established corporations that have shares outstanding and held by members of the investing public. The types of suits that the dissent would encourage could result in large damage claims, costly litigation, generous settlements to avoid such cost, and often—where the litigation runs its course—in large verdicts. The shareholders of the defendant corporations—the "investing public"—would ultimately bear the burden of this litigation, including the fraudulent suits that would not be screened out by the dissent's bare requirement of a "logical nexus between the alleged fraud and the sale or purchase of a security."

[1] *Birnbaum* v. *Newport Steel Corp.*, 193 F. 2d 461 (CA2), cert. denied, 343 U. S. 956 (1952).

1934 Securities Acts, conceded as inconclusive in this particular context; (2) acceptance as precedent of two decades of lower court decisions following a doctrine, never before examined here, that was pronounced by a justifiably esteemed panel of that Court of Appeals regarded as the "Mother Court" in this area of the law,[2] but under entirely different circumstances; and (3) resort to utter pragmaticality and a conjectural assertion of "policy considerations" deemed to arise in distinguishing the meritorious Rule 10b–5 suit from the meretricious one. In so doing, the Court exhibits a preternatural solicitousness for corporate well-being and a seeming callousness toward the investing public quite out of keeping, it seems to me, with our own traditions and the intent of the securities laws. See *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 12 (1971); *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 463 (1969); *Tcherepnin* v. *Knight,* 389 U. S. 332, 336 (1967); *SEC* v. *Capital Gains Bureau,* 375 U. S. 180, 195 (1963).

The plaintiff's complaint—and that is all that is before us now—raises disturbing claims of fraud. It alleges that the directors of "New Blue Chip" and the majority shareholders of "Old Blue Chip" engaged in a deceptive and manipulative scheme designed to subvert the intent of the 1967 antitrust consent decree and to enhance the value of their own shares in a subsequent offering. Although the complaint is too long to reproduce here, see App. 4–22, the plaintiff, in short, contends that the much-negotiated plan of reorganization of Old Blue

---

[2] Just this Term, however, we did not view with such tender regard another decision by the very same panel. See *United States* v. *Feola,* 420 U. S. 671 (1975), and its treatment of an analogy advanced in *United States* v. *Crimmins,* 123 F. 2d 271 (CA2 1941).

Chip, pursuant to the decree and approved by the District Court, was intended to compensate former retailer-users of Blue Chip stamps for damages suffered as a result of the antitrust violations. Accordingly, the majority shareholders were to be divested of 55% of their interest; Old Blue Chip was to be merged into a new company; and 55% of the common shares of the new company were to be offered to the former users on a pro rata basis, determined by the quantity of stamps issued to each of these nonshareholding users during a designated period. Some 621,000 shares were thus to be offered in units, each consisting of three shares of common and a $100 debenture, in return for $101 cash.

It is the plaintiff's pleaded position that this offer to the former users was intended by the antitrust court and the Government to be a "bargain," since the then reasonable market value of each unit was actually $315. The plaintiff alleged, however, that the offering shareholders had no intention of complying in good faith with the terms of the consent decree and of permitting the former users of Blue Chip stamps to obtain the bargain offering. Rather, they conspired to dissuade the offerees from purchasing the units by including substantially misleading and negative information in the prospectus under the heading "Items of Special Interest." The prospectus contained the following statements, allegedly false and allegedly made to deter the plaintiff and its class from purchasing the units: (1) that "[n]et income for the current fiscal year will be adversely affected by payments aggregating $8,486,000 made since March 2, 1968 in settlement of claims" against New Blue Chip; (2) that net income "would be adversely affected by a substantial decrease in the use of the Company's trading stamp service"; (3) that net income "would be adversely affected by a sale of one-third of the Company's trading stamp

business in California"; (4) that "Claims or Causes of Action (as defined) against the Company, including prayers for treble damages, now aggregate approximately $29,000,000"; and (5) that, based upon "statistical evaluations," "the Company presently estimates that 97.5% of all stamps issued will ultimately be redeemed." App. 56, 66.

Plaintiff alleged that these negative statements were known, or should have been known, by the defendants to be false since, for example, the $29,000,000 in purported legal claims were settled for less than $1,000,000 only three months later, and, as a historical fact, less than 90% of all trading stamps are redeemed. Importantly, when the defendants offered their own shares for sale to the public a year later, the prospectus issued at that time made no reference to these factors even though, to the extent that they were relevant on the date of the first prospectus, one year earlier, they would have been equally relevant on the date of the second. As a result of the defendants' negative statements, plaintiff claims that it and its class were dissuaded from exercising their option to purchase Blue Chip shares and that they were damaged accordingly.

From a reading of the complaint in relation to the language of § 10 (b) of the 1934 Act and of Rule 10b–5, it is manifest that plaintiff has alleged the use of a deceptive scheme "in connection with the purchase or sale of any security." To my mind, the word "sale" ordinarily and naturally may be understood to mean, not only a single, individualized act transferring property from one party to another, but also the generalized event of public disposal of property through advertisement, auction, or some other market mechanism. Here, there is an obvious, indeed a court-ordered, "sale" of securities in the special offering of New Blue Chip shares and debentures to former users. Yet the Court denies this

plaintiff the right to maintain a suit under Rule 10b–5 because it does not fit into the mechanistic categories of either "purchaser" or "seller." This, surely, is an anomaly, for the very purpose of the alleged scheme was to inhibit this plaintiff from ever acquiring the status of "purchaser." Faced with this abnormal divergence from the usual pattern of securities frauds, the Court pays no heed to the unremedied wrong or to the portmanteau nature of § 10 (b).

The broad purpose and scope of the Securities Exchange Act of 1934 are manifest. Senator Fletcher, Chairman of the Senate Committee on Banking and Currency, in introducing S. 2693, the bill that became the 1934 Act, reviewed the general purposes of the legislation:

> "Manipulators who have in the past had a comparatively free hand to befuddle and fool the public and to extract from the public millions of dollars through stock-exchange operations are to be curbed and deprived of the opportunity to grow fat on the savings of the average man and woman of America. Under this bill the securities exchanges will not only have the appearance of an open market place for investors but will be truly open to them, free from the hectic operations and dangerous practices which in the past have enabled a handful of men to operate with stacked cards against the general body of the outside investors. For example, besides forbidding fraudulent practices and unwholesome manipulations by professional market operators, the bill seeks to deprive corporate directors, corporate officers, and other corporate insiders of the opportunity to play the stocks of their companies against the interests of the stockholders of their companies." 78 Cong. Rec. 2271 (1934).

The Senator went on to describe the function of each of the many provisions of the bill, including § 9 (c) which, without significant alteration, became § 10 (b) of the Act. He said, as to this section, in terms that surely are broad:

> "The Commission is also given power to forbid any other devices in connection with security transactions which it finds detrimental to the public interest or to the proper protection of investors." *Ibid.*

Similarly, the broad scope of the identical provision in the House version of the bill was emphasized by one of the principal draftsmen, in testimony before the House Committee on Interstate and Foreign Commerce. Summing up § 9 (c), he stated:

> "Subsection (c) says, 'Thou shalt not devise any other cunning devices.'
>
> .    .    .    .    .
>
> ". . . Of course subsection (c) is a catch-all clause to prevent manipulative devices[.]  I do not think there is any objection to that kind of a clause. The Commission should have the authority to deal with new manipulative devices." Testimony of Thomas G. Corcoran, Hearing on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 115 (1934).

In adopting Rule 10b–5 in 1942, the Securities and Exchange Commission issued a press release stating: "The new rule closes a loophole in the protections against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase." SEC Release No. 3230 (May 21, 1942). To say specifically that certain types of fraud are within Rule 10b–5, of course, is not to say that others are necessarily excluded. That this

is so is confirmed by the apparently casual origins of the Rule, as recalled by a former SEC staff attorney in remarks made at a conference on federal securities laws several years ago:

"It was one day in the year 1943, I believe. I was sitting in my office in the S. E. C. building in Philadelphia and I received a call from Jim Treanor who was then the Director of the Trading and Exchange Division. He said, 'I have just been on the telephone with Paul Rowen,' who was then the S. E. C. Regional Administrator in Boston, 'and he has told me about the president of some company in Boston who is going around buying up the stock of his company from his own shareholders at $4.00 a share, and he has been telling them that the company is doing very badly, whereas, in fact, the earnings are going to be quadrupled and will be $2.00 a share for this coming year. Is there anything we can do about it?' So he came upstairs and I called in my secretary and I looked at Section 10 (b) and I looked at Section 17, and I put them together, and the only discussion we had there was where 'in connection with the purchase or sale' should be, and we decided it should be at the end.

"We called the Commission and we got on the calendar, and I don't remember whether we got there that morning or after lunch. We passed a piece of paper around to all the commissioners. All the commissioners read the rule and they tossed it on the table, indicating approval. Nobody said anything except Sumner Pike who said, 'Well,' he said, 'we are against fraud, aren't we?' That is how it happened." Remarks of Milton Freeman, Conference on Codification of the Federal Securities Laws, 22 Bus. Law. 793, 922 (1967).

The question under both Rule 10b–5 and its parent statute, § 10 (b), is whether fraud was employed—and the language is critical—by "any person . . . in connection with the purchase or sale of any security." On the allegations here, the nexus between the asserted fraud and the conducting of a "sale" is obvious and inescapable, and no more should be required to sustain the plaintiff's complaint against a motion to dismiss.

The fact situation in *Birnbaum* itself, of course, is far removed from that now before the Court, for there the fundament of the complaint was that the controlling shareholder had misrepresented the circumstances of an attractive merger offer and then, after rejecting the merger, had sold his controlling shares at a price double their then market value to a corporation formed by 10 manufacturers who wished control of a captive source's supply when there was a market shortage. The Second Circuit turned aside an effort by small shareholders to bring this claim of breach of fiduciary duty under Rule 10b–5 by concluding that the Rule and § 10 (b) protected only those who had bought or had sold securities.

Many cases applying the *Birnbaum* doctrine and continuing critical comments from the academic world [3] fol-

---

[3] See, *e. g.*, Lowenfels, The Demise of the *Birnbaum* Doctrine: A New Era for Rule 10b–5, 54 Va. L. Rev. 268 (1968); Boone & McGowan, Standing to Sue Under SEC Rule 10b–5, 49 Tex. L. Rev. 617 (1971); Whitaker, The *Birnbaum* Doctrine: An Assessment, 23 Ala. L. Rev. 543 (1971); Ruder, Current Developments in the Federal Law of Corporate Fiduciary Relations—Standing to Sue Under Rule 10b–5, 26 Bus. Law. 1289 (1971); Fuller, Another Demise of the Birnbaum Doctrine: "Tolls the Knell of Parting Day?", 25 Miami L. Rev. 131 (1970); Comment, Dumping *Birnbaum* to Force Analysis of the Standing Requirement under Rule 10b–5, 6 Loyola L. J. 230 (1975); Note, Standing to Sue in 10b–5 Actions, 49 Notre Dame Law. 1131 (1974); Comment, 10b–5 Standing Under Birnbaum: The Case of the Missing Remedy, 24 Hastings L. J. 1007 (1973); Comment, The Purchaser-Seller Requirement of

lowed in its wake, but until today the Court remained serenely above the fray.

To support its decision to adopt the *Birnbaum* doctrine, the Court points to the "longstanding acceptance by the courts" and to "Congress' failure to reject *Birnbaum's* reasonable interpretation of the wording of § 10 (b)." *Ante,* at 733. In addition, the Court purports to find support in "evidence from the texts of the 1933 and 1934 Acts," although it concedes this to be "not conclusive." *Ibid.* But the greater portion of the Court's opinion is devoted to its discussion of the "danger of vexatiousness," *ante,* at 739, that accompanies litigation under Rule 10b–5 and that is said to be "different in degree and in kind from that which accompanies litigation in general." *Ibid.* It speaks of harm from the "very pendency of the lawsuit," *ante,* at 740, something like the recognized dilemma of the physician sued for malpractice; of the "disruption of normal business activities which may accompany a lawsuit," *ante,* at 743; and of "proof . . . which depend[s] almost entirely on oral testimony," *ibid.,* as if all these were unknown to lawsuits taking place in America's courthouses every day. In turning to, and being influenced by, these "policy considerations," *ante,* at 737, or these "considerations of policy," *ante,* at 749, the Court, in my view, unfortunately mires itself in speculation and conjecture

Rule 10b–5 Reevaluated, 44 U. Colo. L. Rev. 151 (1972); Comment, Inroads on the Necessity for a Consummated Purchase or Sale Under Rule 10b–5, 1969 Duke L. J. 349; Comment, The Decline of the Purchaser-Seller Requirement of Rule 10b–5, 14 Villanova L. Rev. 499 (1969); Comment, The Purchaser-Seller Limitation to SEC Rule 10b–5, 53 Cornell L. Rev. 684 (1968); Comment, The Purchaser-Seller Rule: An Archaic Tool for Determining Standing Under Rule 10b–5, 56 Geo. L. J. 1177 (1968). See Note, Limiting the Plaintiff Class: Rule 10b–5 and the Federal Securities Code, 72 Mich. L. Rev. 1398, 1412 (1974).

not usually seen in its opinions. In order to support an interpretation that obviously narrows a provision of the securities laws designed to be a "catch-all," the Court takes alarm at the "practical difficulties," *ante*, at 754, 755, that would follow the removal of *Birnbaum*'s barrier.

Certainly, this Court must be aware of the realities of life, but it is unwarranted for the Court to take a form of attenuated judicial notice of the motivations that defense counsel may have in settling a case, or of the difficulties that a plaintiff may have in proving his claim.

Perhaps it is true that more cases that come within the *Birnbaum* doctrine can be properly proved than those that fall outside it. But this is no reason for denying standing to sue to plaintiffs, such as the one in this case, who allegedly are injured by novel forms of manipulation. We should be wary about heeding the seductive call of expediency and about substituting convenience and ease of processing for the more difficult task of separating the genuine claim from the unfounded one.

Instead of the artificiality of *Birnbaum*, the essential test of a valid Rule 10b–5 claim, it seems to me, must be the showing of a logical nexus between the alleged fraud and the sale or purchase of a security. It is inconceivable that Congress could have intended a broad-ranging antifraud provision, such as § 10 (b), and, at the same time, have intended to impose, or be deemed to welcome, a mechanical overtone and requirement such as the *Birnbaum* doctrine. The facts of this case, if proved and accepted by the factfinder, surely are within the conduct that Congress intended to ban. Whether this particular plaintiff, or any plaintiff, will be able eventually to carry the burdens of proving fraud and of proving reliance and damage—that is, causality and injury—is a matter that should not be left to specula-

tions of "policy" of the kind now advanced in this forum so far removed from witnesses and evidence.

Finally, I am uneasy about the type of precedent the present decision establishes. Policy considerations can be applied and utilized in like fashion in other situations. The acceptance of this decisional route in this case may well come back to haunt us elsewhere before long. I would decide the case to fulfill the broad purpose that the language of the statutes and the legislative history dictate, and I would avoid the Court's pragmatic solution resting upon a 20-odd-year-old, severely criticized doctrine enunciated for a factually distinct situation.

In short, I would abandon the *Birnbaum* doctrine as a rule of decision in favor of a more general test of nexus, just as the Seventh Circuit did in *Eason* v. *General Motors Acceptance Corp.,* 490 F. 2d 654, 661 (1973), cert. denied, 416 U. S. 960 (1974). I would not worry about any imagined inability of our federal trial and appellate courts to control the flowering of the types of cases that the Court fears might result. Nor would I yet be disturbed about dire consequences that a basically pessimistic attitude foresees if the *Birnbaum* doctrine were allowed quietly to expire. Sensible standards of proof and of demonstrable damages would evolve and serve to protect the worthy and shut out the frivolous.