In re INVESTORS FUNDING CORPORATION OF NEW YORK SECURITIES LITIGATION.

Morris KATZ, et al., Plaintiffs,

v.

Jerome DANSKER, et al., Defendants.

Rachel L. ROTHCHILD, Plaintiff,

v.

Jerome DANSKER, et al., Defendants.

Dr. Bernard METRICK and Bernard Metrick, Custodian for Zachary Metrick, Plaintiffs,

v.

Jerome DANSKER, et al., Defendants.

David HABER and Ruth Haber, Plaintiffs,

v.

Jerome DANSKER, et al., Defendants.

MDL No. 290.
Nos. 76 Civ. 4721(WCC), 77 Civ. 616(WCC), 78 Civ. 268(WCC) and 78 Civ. 532(WCC).

United States District Court,
S. D. New York.

Dec. 8, 1980.

and Metrick; Daniel W. Krasner, New York City, of counsel.

Pincus, Munzer, Bizar & D'Allesandro, New York City, for plaintiffs Rothchild and Haber; Irving Bizar, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Peat, Marwick, Mitchell & Co.; R. Anthony Zeiger, John H. de Boisblanc and Leonard P. Novello, Associate Gen. Counsel, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Ernst & Whinney, as successor to S. D. Leidesdorf & Co.; David I. Goldblatt, David Aronson, Gary B. Bettman, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Before the Court are motions by defendants Peat, Marwick, Mitchell & Co. ("PMM") and Ernst & Whinney, as successor to S. D. Leidesdorf & Co. ("Leidesdorf") for summary judgment, pursuant to Rule 56, F.R.Civ.P., or alternatively to dismiss the complaint, Rule 12(b)(6), F.R.Civ.P. ("motions to dismiss") in the four above-subcaptioned cases ("*Katz*," "*Rochchild*," "*Metrick*" and "*Haber*"). In his Report Number 21 ("Report"), Magistrate Harold J. Raby recommends the granting of Leidesdorf's motion as to *Katz, Rothchild, Metrick* and *Haber*, the granting of PMM's motion as to *Katz* and *Rothchild*, and the denial of PMM's motion as to *Metrick* and *Haber*. Plaintiffs have filed objections to the Report to the extent it recommends the granting of the motions, while PMM has filed objections to the Report to the extent it recommends the denial of its motions. Consequently, this Court must make a *de novo* determination as to the motions, as required by 28 U.S.C. § 636(b)(1).

## BACKGROUND

Each of the complaints in the four cases under consideration seeks certification of a specified class of purchasers of securities issued by Investors Funding Corporation of

Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiffs Katz

New York ("IFC"), which petitioned for reorganization under Chapter X of the Federal Bankruptcy Act on October 21, 1974. The following chart summarizes for each of the four actions the purported plaintiff class, the named plaintiffs and the dates of purchases of IFC securities by each named plaintiff as set forth in the complaints:

| Action | Class | Plaintiff | Purchase Dates |
|---|---|---|---|
| Katz | purchasers of a class A common stock and warrants exercisable for the purchase of class A common stock from January 1, 1968 to October 21, 1974 | Morris Katz | January 7, 1969 |
| | | Elizabeth Gitlin | April 7, 1969<br>February 25, 1970 * |
| | | Harry Gross | November 22, 1968<br>January 29, 1969 |
| | | Herbert D. Bank | November 12, 1969<br>April 1970 *<br>April 12, 1971 * |
| Rothchild | purchasers of debentures from December 31, 1967 to October 21, 1974 | Rachel Rothchild | March 11, 1968 |
| Metrick | purchasers of class A common stock and warrants exercisable for the purchase of class A common stock from January 1, 1968 to October 21, 1974 | Bernard Metrick | May 27, 1968<br>February 17, 1970<br>December 8, 1971<br>January 28, 1972<br>April 3, 1972 |
| Haber | purchasers of debentures from December 31, 1967 to October 21, 1974 | David and Ruth Haber | April 5, 1972 |

* These purported purchases are not recited in the complaint, but are the subject of a motion to amend the Katz complaint, which is here granted.

The substantive allegations of the four complaints are identical, and may be summarized as a unit. Each complaint names a multitude of defendants, including IFC's officers, directors, banks, attorneys and accountants. Each complaint states three counts, with the second being directed at PMM and Leidesdorf, the third being directed at certain banks, and the first being directed at all other defendants. The complaints allege a scheme by defendants other than PMM and Leidesdorf to defraud purchasers of IFC securities, in significant part by publishing financial statements which portrayed IFC's financial circumstances as relatively sound when in fact IFC was virtually or actually insolvent. The claims against PMM and Leidesdorf are stated in the familiar averments of accountant malpractice, including the fundamental allegations that PMM and Leidesdorf were engaged as the independent auditors of IFC for the calendar years 1968–1971 and 1972–1973, respectively; that PMM and Leidesdorf certified as accurate IFC financial statements which were in fact materially misleading; that, upon information and belief, PMM and Leidesdorf knew or recklessly failed to discover certain facts which should have led them to have further investigated and ultimately not to have certified the IFC financial statements as actually issued: and that consequently PMM and Leidesdorf are liable both as principals and as aiders and abettors of other defendants, pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder, and the common law.

The record further indicates the following chronology of relevant events surround-

ing the services performed by PMM and Leidesdorf for IFC:

(1) on March 5 and March 6 of 1969, a brief statement of IFC's net income for 1968 was released and appeared in the New York Times and the Wall Street Journal;

(2) on May 1, 1969, IFC publicly issued its. financial statements for the year 1968, copies of which were received by the Securities and Exchange Commission ("SEC") on IFC's 1968 Form 10–K report. These financial statements contained the report of PMM dated March 5, 1969,[1] the first report of PMM on IFC financial statements; and

(3) according to the complaints, Leidesdorf did not commence services for IFC until February 28, 1973.

DISCUSSION

In support of their motions, PMM and Leidesdorf ("accountants") advance the following six grounds:

(1) that any malfeasance by the accountants could not have been in connection with the purchase or sale of securities because plaintiffs' purchases predated the issuance of financial statements reported on by the accountants;[2]

(2) that the complaints fail to plead scienter;

(3) that the complaints fail to plead fraud with particularity as required by Rule 9(b), F.R.Civ.P.;

(4) that the claims against the accounts are cognizable under Section 18 of the 1934 Act, 15 U.S.C. § 78r, and thus are not also impliedly actionable pursuant to Section 10(b);

(5) that the *Metrick* and *Haber* actions are duplicative of the previously-filed *Katz* and *Rothchild* actions, respectively; and

(6) that pendent jurisdiction over the common law claims is lacking.

1. *Purchases of Securities by Plaintiffs*

The accountants contend (except PMM as to *Metrick* and *Haber*) that plaintiffs pur-

chased their IFC shares prior to the issuance of any financial statements reported on by the accountants, and that consequently as a matter of law plaintiffs cannot state cognizable claims against the accountants pursuant to Section 10(b). This contention requires the examination of both the record to test its premise and the law to test its conclusion.

The record plainly reveals that Leidesdorf's position is factually indisputable. Every purchase by every plaintiff in all four actions was made no later than 1972, whereas Leidesdorf did not even commence services for IFC until February 28, 1973. As to PMM, which asserts this position only as to the *Katz* and *Rothchild* plaintiffs, it is not disputed that PMM is factually correct as to plaintiffs Morris Katz, Harry Gross and Rachel Rothchild. The parties do clash, however, as to the purported purchases of Elizabeth Gitlin ("Gitlin") and Herbert D. Bank ("Bank").

■ With respect to the purported April 7, 1969 purchase by Gitlin, PMM points out that this purchase predated the May 1, 1969 issuance of the first IFC financial statements reported on by PMM. Plaintiffs respond by pointing to the March 5 and 6, 1969 news release as having predated Gitlin's purchase. Plaintiffs' position is not persuasive. Even assuming that reliance on such a skeletal report in purchasing securities would have been reasonable, and even further assuming that the March release could be sufficiently tied to PMM where the figures in the March release did not indicate they had been audited and where PMM apparently did not complete and issue its report until May 1, *but see Gold v. DCL Inc.*, 399 F.Supp. 1123, 1127–28 (S.D.N.Y. 1973), the *Katz* complaint does not allege that Gitlin ever saw the March release, much less that she relied upon it. Rather, although the complaint lists the documents which were allegedly false and misleading

1. According to PMM, this date customarily signifies the conclusion of active field work, but not the conclusion of the review of evidentiary matter or the final preparation of the report.

2. PMM raises this argument only as to *Katz* and *Rothchild*; Leidesdorf asserts this position as to all four of the actions.

as to IFC's financial health, and which "were used and relied upon by plaintiffs and the Class in connection with their purchase of IFC securities," the March release appears neither in this list nor anywhere else in the complaint. In fact, this list includes financial statements for the year 1967 reported on by auditors not named as defendants in these actions, and thus the only reasonable reading of the *Katz* complaint is that Gitlin's April 1968 purchase was made on the basis of these 1967 financial statements.

Nor does Gitlin bring the March release to the Court's attention by way of a personal affidavit attesting to her prior knowledge thereof. Instead, PMM's motion is opposed by an affidavit from plaintiff's attorney, suggesting only that *he* has recently become aware of the March release by virtue of a communication from another attorney in a related case. Plaintiffs at most have suggested that Gitlin could have been aware of the existence of the March release; plaintiffs' unwillingness to take the obvious next step and allege that the March release was relied upon by Gitlin in making her April 1968 purchase—allegations which plaintiffs have made as to the publicly issued financial statements for the year 1967 —can only suggest that Gitlin cannot in good faith make such an allegation. In the absence of such an averment, the March 5 release is an irrelevant event, and Gitlin's position is no better than that of her co-plaintiffs who purchased prior to the public issuance of IFC's 1968 financial statements.

With respect to the November 12, 1969 purchase by Bank, this purchase was subsequent to the May 1, 1969 issuance of IFC financial statements. Consequently, PMM has offered an alternative contention as to why this purchase cannot be the basis for a claim against it. The record discloses that Bank acquired the IFC common stock in exchange for IFC's 8% registered subordinated promissory note in the principal amount of $10,000. PMM argues that since the alleged inflated value of IFC securities resulting from its false financials certified by PMM would have affected both the promissory note and the common stock, Bank was not damaged by virtue of the exchange or by the alleged acts of PMM. Plaintiffs do not dispute PMM's analysis, and the Court is persuaded that on this ground Bank's November 12, 1969 exchange cannot be the basis of a federal securities law claim against PMM.

■ With respect to the purported purchases of Bank in April 1970 and on April 12, 1971, and those of Gitlin on February 25, 1970, again these purchases obviously postdate the May 1, 1969 issuance of IFC financial statements. Consequently, PMM has taken the alternative position that its motion must be granted because the record indicates that plaintiffs cannot prove that such purchases were made, although PMM offers no affidavits or other evidentiary submissions in support of its position that the purchases were not made. In response, plaintiffs have submitted the affidavits of Bank and Gitlin attesting to such purchases, accompanied in Bank's case by certificates representing the various securities purchased. While PMM argues that plaintiffs cannot by such evidence prove their purchases, in the absence of any evidence to the contrary, PMM clearly has not sustained its own burden on its motion of proving that no issue of material fact exists on this record as to whether these purchases were actually made.

Accordingly, PMM's factual premise— that plaintiffs purchased prior to the first issuance of IFC financial statements reported on by PMM—is misplaced as to the post-1969 purchases by Gitlin and Bank.[3]

---

3. PMM raises two additional legal arguments as to the post-1969 purchases by Gitlin and Bank which may summarily be disposed of. First, PMM points out that several of these purchases were of warrants, not of common stock. PMM does not and cannot point to any significance to this observation, however, since warrants are no less securities than common stock, see Section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10). Second, PMM highlights that in several circumstances the warrants were acquired in connection with the purchase of debentures, but offers no explanation as to why this makes the portion of plaintiffs' purchases relating to warrants any less actionable.

■ Turning to the law, it is not disputed that as a general proposition plaintiffs who purchased securities prior to the issuance of IFC financial statements reported on by the accountants have no standing to maintain an action under Section 10(b) against the accountants. *E. g., Denny v. Barber*, 76 Civ. 548 (MEL) (S.D.N.Y. September 30, 1977), *aff'd*, 576 F.2d 465, 1978 CCH Fed. Sec.L.Rep. ¶ 96,438 (2d Cir. 1978). Plaintiffs, however, advance two theories upon which they seek to establish the standing of the "premature purchasers" in the instant case.

First, plaintiffs argue that the accountants, as co-conspirators of other defendants, are liable for acts done by other defendants prior to the date on which the accountants joined in the conspiracy. Plaintiffs quote from *In re Nissan Motor Corp. Antitrust Litigation*, 430 F.Supp. 231, 233 (S.D.Fla. 1977), the principle that

"one who enters a conspiracy late, with knowledge of what has gone before and with intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy." (footnote omitted).

The accountants have argued that the application of this "relation-back" co-conspiratorial liability to Section 10(b) is impermissible because inconsistent with the requirement that the injury to plaintiffs resulting from defendants' fraud have been suffered in connection with the purchase or sale of a security, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). There is, however, no reason for the Court to address this issue, for it is plain that the complaints are devoid of any factual allegations of conspiracy on the part of the accountants.

While the first count of the complaints purports to allege a conspiracy as to defendants other than the accountants, by contrast the second count, directed at the accountants, pleads neither a general allegation of conspiracy nor any facts supporting such a theory of liability. In fact, there is no mention of conspiracy in connection with PMM anywhere in the complaints. And while there is a single reference to Leidesdorf having "joined the aforesaid conspiracy," that conclusory averment in its context suggests only that by performing auditing services for IFC for the years 1972–73 Leidesdorf somehow joined a conspiracy.

As detailed above, the complaints essentially allege that the accountants knew or recklessly failed to discover facts available to them, and as a consequence certified as accurate financial statements which were in fact false and misleading. Apparently, plaintiffs view such allegations as establishing the accountants' participation in the alleged conspiracy on the theory that the alleged acts of the accountants were integral to the effectuation of the conspiracy. But even if the accountants' acts were as critical as alleged, that fact does "not cast them in liability as co-conspirators absent a showing they knowingly participated in and attached themselves to the conspiracy." *Hoffman v. Herdman's LTD.*, 41 F.R.D. 275, 278 (S.D.N.Y.1966). Plaintiffs' own quotation of the principle they seek to rely upon from *Nissan, supra*, requires that the late-arriving co-conspirator actually have entered the conspiracy and intended to pursue its objectives. There simply are no such allegations in the complaints. Plaintiffs' "co-conspirator" theory of standing thus collapses upon the failed premise that the complaints plead a conspiracy participated in by the accountants.

■ Second, plaintiffs before this Court now argue that even if they lack standing individually, they have standing as representatives of purported class members who purchased after the issuance of IFC financial statements reported on by PMM or Leidesdorf. In *Denny v. Barber, supra* at page 93,582, the Second Circuit on similar facts noted that "if Denny himself cannot share in any recovery because no fraud-

ulent statements were issued before his purchase, he would not be a proper representative of persons who bought securities after fraudulent statements were issued . . . ." (footnote and citations omitted). Whether the issue is viewed in terms of standing or in terms of meeting the typicality requirement of a class representative, a plaintiff may not prosecute a case on behalf of a class of which he is not a member. *E. g., Alexander v. Yale University*, 631 F.2d 178 (2d Cir. 1980). Here, assuming that there are classes of IFC securities purchasers injured as a result of financial statements certified by PMM (or by Leidesdorf), plaintiffs who purchased prior to the issuance of such financial statements are not members of such classes.

■ Plaintiffs argue that their standing to sue other defendants is sufficient to enable them to represent class members who have claims against the accountants because of the purported conspiracy and common course of conduct among all the defendants. Whatever the merit of such a position generally, by its own terms it has no application here where, as noted above, the complaints do not allege that the accountants were engaged in a common conspiracy to defraud, either with each other or with other defendants. See *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973).

For these reasons, Leidesdorf's motions to dismiss the Section 10(b) claim in *Katz, Rothchild, Metrick* and *Haber* are granted; PMM's motion to dismiss the Section 10(b) claim in Rothchild is granted; and PMM's motion to dismiss the Section 10(b) claim in *Katz* is granted, except that it is denied as to the 1970 and 1971 securities purchases by plaintiffs Gitlin and Bank.

Accordingly, the balance of this Opinion, with the exception of the issue of pendent jurisdiction over common law claims, see Point 6, *infra*, concerns only PMM's motions to dismiss in *Metrick, Haber* and the surviving portion of *Katz*.

## 2. Scienter

■ In this Circuit, proof of reckless conduct will generally satisfy the requirement of scienter in a Section 10(b) claim. See, *e. g., IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980). In those circumstances where recklessness has thus been held to be sufficient, the courts have frequently pointed to the defendant's fiduciary duty or obligation to disclose as a critical element triggering the higher standard of care incident to the recklessness standard. See, *e. g., Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). For the imposition of aider and abettor liability under Section 10(b), the Second Circuit has held that recklessness satisfies the scienter requirement where "the alleged aider and abettor owes a fiduciary duty to the defrauded party," but has not reached the question whether recklessness is sufficient in the absence of such a relationship. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44 and n.9 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

■ In this case, if the accountant's duty to disclose is treated only as broadly as the accountant-client relationship, then it would not extend to plaintiffs. However, at least one court has concluded that recklessness is sufficient to establish scienter where plaintiffs are third parties whose reliance upon the accountant's audit or opinion letter is reasonably foreseeable, *Olek v. Fischer*, 73 Civ. 1460 (CSH) (S.D.N.Y. June 8, 1979), *aff'd*, 623 F.2d 791 (2d Cir. 1980), a conclusion with which this Court agrees. Certainly, reliance by purchasers of IFC securities upon the audits and opinion letters of PMM as to IFC financial statements was reasonably foreseeable to PMM. In fact, the complaints specifically allege that PMM knew that the certified IFC financial statements would be distributed to and relied upon by prospective purchasers of IFC securities. Under these circumstances, I conclude that PMM's disclosure obligations to plaintiffs was sufficient to trigger the

application of "recklessness" as the appropriate scienter standard.[4]

It is not disputed by PMM that the complaints allege recklessness on the part of PMM. Accordingly, PMM's position that scienter is not alleged in the complaints is without merit.

### 3. *Rule 9(b)*

Rule 9(b), F.R.Civ.P., requires that the circumstances constituting fraud be pleaded with particularity. In a prior order, this Court approved Magistrate Raby's report recommending dismissal of the *Katz* and *Rothchild* complaints because of the failure to specify alleged misrepresentations relating to particular financial statements reported on by particular auditors. PMM argues that the existing complaints do not cure this defect, but I do not agree.

The problem with the original *Katz* and *Rothchild* complaints, as spelled out by Magistrate Raby in his Report No. 8 of December 12, 1977, was that several accounting firms were employed by IFC during the class period, and the general allegations of misrepresentations failed to put each accountant defendant on notice as to which of the many financial improprieties are charged to have been inadequately reflected in financial statements reported on by it. The existing complaints, while far from perfect in this regard, do adequately put PMM on notice as to which transactions were allegedly misreported or concealed in the financial statements recklessly certified by PMM. Paragraph 76 of the *Katz* and *Metrick* complaints, and paragraph 77 of the *Haber* complaint, specifically list matters which PMM is alleged to have knowingly disregarded or recklessly overlooked in erroneously certifying IFC financial statements. And while the complaints retain certain joint references to PMM and Leidesdorf, the references are in connection with dated transactions permitting PMM to

ascertain particular allegations against it. See *Morse v. Peat, Marwick, Mitchell & Co.*, 1975–76 CCH ¶ 95,492 (S.D.N.Y.1976) (WCC).

PMM's contention that greater specificity in this regard is possible is no doubt correct. But Rule 9(b) must be construed in conjunction with the requirement of Rule 8(a), F.R.Civ.P., that pleadings be short and concise. *E. g., Felton v. Walston and Co., Inc.*, 508 F.2d 577, 581 (2d Cir. 1974). Without belaboring the issue, I am satisfied that these complaints have crossed the threshold erected by Rule 9(b) by adequately putting PMM on notice of the claims made specifically against it. PMM's thirst for detail as to these claims may be satisfied by the various means of discovery available to it.

### 4. *Exclusivity of Section 18*

PMM has contended that, because the allegedly misleading financial statements upon which its purported liability is predicated were filed with the SEC, the exclusive remedy is under Section 18, which specifically applies to false or misleading statements contained in documents filed with the SEC, and that there is no alternative remedy under the more general Section 10(b). Since PMM first advanced this position, the Second Circuit Court of Appeals has ruled expressly to the contrary in *Ross v. A. H. Robins Co.*, 607 F.2d 545 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), which is of course dispositive of this argument here.

### 5. *Duplicative Complaints*

The complaints in *Katz* and *Metrick* are identical with the exception of the named plaintiffs; they seek certification as to the identical plaintiff class.[5] PMM seeks dismissal or a stay of the later-filed *Metrick* action as duplicative of *Katz*. PMM's mo-

---

**4.** To the extent Magistrate Raby's Report and this Opinion constitute a departure from certain language in a prior report of the Magistrate approved by the Court, this Opinion nevertheless embodies the view of this Court on this issue.

**5.** So too are the *Rothchild* and *Haber* complaints, but the dismissal of the *Rothchild* complaint against PMM, see Point 1, *supra*, and Point 6, *infra*, moots PMM's claim of duplication as to these.

tion on this ground must be denied as premature.

No class has as yet been certified in either action, and as non-class suits on behalf of separate individuals the actions are not duplicative. PMM should raise this issue if and when a class is certified in either or both actions.

Of course, if in the interim PMM is prejudiced by any duplication of effort incident to this situation, it may apply to the Court for appropriate relief. PMM has not complained of any such prejudice, nor is it likely to in view of the fact that the *Katz* plaintiffs and the *Metrick* plaintiffs are represented by the same counsel.

### 6. *Pendent Jurisdiction*

Plaintiffs in their legal memoranda have identified their "common law" claims as claims that plaintiffs retained their securities in reliance upon the IFC financial statements reported on by the accountants, claims admittedly without the ambit of Section 10(b), *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). The accountants argue that to the extent several of the plaintiffs in this action do not have cognizable federal claims, see Point 1, *supra*, there is no pendent jurisdictional basis for the common law claims by these same plaintiffs. An assessment of the claim of pendent jurisdiction under the circumstances of this case requires separate consideration of pendent claim jurisdiction and pendent party jurisdiction.

Pendent claim jurisdiction presumes the existence of a claim over which the court has federal jurisdiction, and another claim involving the same parties lacking federal question or diversity jurisdiction. The exercise of pendent jurisdiction over the latter claim is appropriate if (1) the court has power under Article III, Section 2 of the Constitution to assert jurisdiction over the pendent claim, measured by whether the pendent claim and a "substan-

tial" federal claim derive from a common nucleus of operative facts, and (2) the court in its discretion determines to exercise pendent jurisdiction, based upon considerations of judicial economy, convenience and fairness to the litigants. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well" (footnote omitted), *id.* at 726, 86 S.Ct. at 1139; *Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 254 (2d Cir. 1979), absent exceptional circumstances not present here, *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974). Consequently, there can be no pendent claim jurisdiction here over common law claims by plaintiffs whose federal claims have been dismissed. See Point 1, *supra*.

Pendent party jurisdiction, on the other hand, may typically be sought by one who has no claim against the relevant party for which there is federal jurisdiction, but only a related claim against another party for which there is federal jurisdiction. Plaintiffs' theory here is that the accountants are pendent defendants; *i. e.*, that plaintiffs' common law claims against the accountants, against whom they have no federal claims, are pendent to plaintiffs' claims against other defendants.[6] Pendent party jurisdiction is not only subject to the two requirements of *Gibbs, supra*, but also requires a determination "that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence." *Aldinger v. Howard*, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976).

In *Aldinger, supra*, the Court reasoned that pendent party jurisdiction is far more questionable than pendent claim jurisdiction:

> "The situation with respect to the joining of a new party, however, strikes us as being both factually and legally different

**6.** As to PMM, these plaintiffs could also argue that they are pendent plaintiffs; *i. e.*, that their common law claims against PMM are pendent to federal claims against PMM by other plaintiffs.

from the situation facing the Court in *Gibbs* and its predecessors. From a purely factual point of view, it is one thing to authorize two parties, already present in federal court by virtue of a case over which the court has jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction. But it is quite another thing to permit a plaintiff, who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to join an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction, simply because his claim against the first defendant and his claim against the second defendant 'derive from a common nucleus of operative fact.' *Ibid.* True, the same considerations of judicial economy would be served insofar as plaintiff's claims 'are such that he would ordinarily be expected to try them all in one judicial proceeding . . . .' *Ibid.* But the addition of a completely new party would run counter to the well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress."

*Id.* at 14–15, 96 S.Ct. at 2420. In *Aldinger*, the plaintiff brought suit against a county defendant and several county officials under 42 U.S.C. § 1983 for the allegedly unconstitutional termination of his employment. A separate count was asserted against the county on state law grounds. The federal claim against the county was dismissed, properly under the law at the time. The Court then held that the absence of a federal claim against a county under Section 1983 was by implication a Congressional determination that pendent party jurisdiction over the county for a state law claim on essentially the same facts was negated. The Court concluded:

"If the new party sought to be joined is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if parties already before the court are required to litigate a state-law claim. Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence."

*Id.* at 18, 96 S.Ct. at 2422.

The *Aldinger* ruling manifested itself shortly thereafter in *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). In *Kroger*, respondent ("Kroger") brought suit against OPPD, alleging a state-law claim with jurisdiction based upon diversity of citizenship. OPPD impleaded petitioner ("Owen"), and Kroger amended her complaint naming Owen as an additional defendant, although no diversity existed between Kroger and Owen. Following a successful motion for summary judgment by OPPD, the case went to trial on Kroger's claim against Owen. The Court, relying upon *Aldinger*, ruled that no pendent party jurisdiction over this claim could be asserted, because Congress, by requiring complete diversity of citizenship between the parties, had impliedly negated the exercise of such jurisdiction by federal courts. If it ruled otherwise, the Court noted, the Congressional mandate could be defeated by "suing only those defendants who were of diverse citizenship and waiting for them to implead nondiverse defendants" (citation omitted). *Id.* at 374, 98 S.Ct. at 2403.

Applying these principles to the instant case, the Court agrees with the accountants' contention that pendent party jurisdiction is inapplicable to the common law claims against the accountants by plaintiffs who have no federal claims against them. The statutory basis of plaintiffs' federal claims against other defendants—Section 10(b)—is limited to fraud in connection with the purchase or sale of a security. See Point 1, *supra*. To assume jurisdiction of pendent party claims by these plaintiffs against the accountants would be to subvert the implied Congressional mandate that federal jurisdiction not be extended to securities-related

claims where no federal securities laws claim exists between these parties.

Plaintiffs argue that, unlike those claims raised in *Aldinger* and *Kroger*, the federal and common law claims raised here can be adjudicated together only in a federal forum because of the exclusive federal jurisdiction over Section 10(b) claims, 15 U.S.C. § 78aa. This fact, however, does not dictate a result contrary to that in *Aldinger* and *Kroger*. The Court in both *Aldinger*, 427 U.S. at 15, 96 S.Ct. at 2420, and *Kroger*, 437 U.S. at 377, 98 S.Ct. at 2404, emphasized that, in determining the appropriateness of an exercise of pendent or ancillary jurisdiction, considerations of efficiency cannot be paramount because federal courts are courts of limited jurisdiction circumscribed not only by Article III but by evident Congressional design. Where, as here, Congress has impliedly spoken as to the scope of federal jurisdiction over claims between parties, any inefficiency resulting from the prosecution of claims against some defendants in federal court and against others in state court is insufficiently compelling to require the federal court to exercise pendent party jurisdiction.[7]

Plaintiffs may also argue that in the *Katz* action, by virtue of this Opinion, plaintiffs Gitlin and Bank may prosecute both federal and common law claims against PMM, and that to permit the other named plaintiffs in that action to prosecute common law claims against PMM would not require joining a defendant as to whom no independent basis for federal jurisdiction is asserted. Again, however, the rationale of *Aldinger* and *Kroger* does not permit retreat from the result in those cases here simply because PMM is already a party as to other plaintiffs: if the Court lacks subject matter jurisdiction, it also lacks the power of its discretionary exercise.[8] Moreover, the danger warned of in *Kroger*—subversion of Congressional limitations by artful pleading—is potentially exemplified here, where plaintiffs theoretically could transport an entire class of common law claimants into federal court on the coattails of but two individuals with federally cognizable claims. Under these circumstances, federal jurisdiction cannot rest solely on the fortuitous coincidence of one party's claims with those of another who is properly in federal court.

For these reasons, the Court concludes that the accountants' motions to dismiss the common law claims must be granted to the same extent as the motions to dismiss the federal claims.

## CONCLUSION

Leidesdorf's motions to dismiss are granted in *Katz, Rothchild, Metrick* and *Haber*. PMM's motions to dismiss are granted in *Rothchild*, denied in *Metrick* and *Haber*, and granted in part and denied in part in *Katz* as specified herein.

SO ORDERED.

---

7. *Maltais v. United States*, 439 F.Supp. 540 (N.D.N.Y.1977), relied upon by plaintiffs, is inapposite. While the court there did point to the fact that there was exclusive federal jurisdiction over the federal claim as a reason for accepting pendent party jurisdiction as to the state-law claims against other defendants, the court determined, in accordance with *Aldinger*, that the exercise of pendent party jurisdiction was consistent with, rather than as here contrary to, the Congressional intent underlying the statutory basis for the federal claim. *Id.* at 548.

8. Since the common law claims of all the plaintiffs against Leidesdorf and of the *Rothchild* plaintiff against PMM must be pressed, if at all, in state court, there is arguably no loss of efficiency in requiring certain of the *Katz* plaintiffs to join them.