SECURITIES AND EXCHANGE
COMMISSION, Plaintiff–
Appellee,

v.

RANA RESEARCH, INC. (d/b/a Vista
Group, Ltd.), Defendant–
Appellant.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff–
Appellee,

v.

RANA RESEARCH, INC. (d/b/a Vista
Group, Ltd.), Defendant;

Vipin Sahgal, Defendant–Appellant;

Robert H. Bretz, Appellant.

Nos. 90–56230, 91–55044.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1992.

Decided Nov. 3, 1993.

---

Robert H. Bretz, Marina del Rey, CA, for defendants-appellants.

Eric Summergrad, Asst. General Counsel, S.E.C., Washington, DC, for plaintiffs-appellees.

Before: NELSON, HALL and RYMER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Rana Research, Inc. and its president/sole shareholder Vipin Sahgal ("Defendants") appeal judgments permanently enjoining them from violating section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5. The district court had jurisdiction under 15 U.S.C. §§ 78u, 78aa, and this Court has jurisdiction under 28 U.S.C. § 1291.

Defendants raise numerous contentions on appeal, the majority of which we resolve in an unpublished memorandum disposition filed contemporaneously with this opinion. One claim, however, raises an issue of first impression in this circuit and on that issue we hold that the SEC need not prove reliance as an element of its case in an action to enjoin future violations of section 10(b) and Rule 10b–5.

I

Sahgal is a business and financial consultant operating through his private firm Rana Research, Inc., doing business under the name The Vista Group, Ltd. (Rana/Vista). In the fall of 1987, Sahgal became interested in Superior Industries International, Inc. (Superior), a publicly-traded company whose stock was trading on the American Stock Exchange ("AMEX") at a price range of $8 to $10 per share. Sahgal believed that the shares were undervalued, and that Superior was a good candidate for an acquisition.

Superior and Rana/Vista each used the law firm, Hill & Weiss, for legal services. Partner Ronald Givner represented Rana/Vista, and partner Marco Weiss represented Superior. Weiss was also a long-time member of Superior's Board of Directors. At Sahgal's request, Givner arranged a meeting in October 1987 between himself, Weiss and Sahgal to discuss Rana/Vista's interest in Superior. Weiss agreed to call Superior's president, Louis Borick, to see if he thought Superior might be interested in a possible transaction. Borick controlled approximately 25 to 30 percent of Superior's stock, making a transaction without his cooperation nearly impossible. Shortly after, Weiss reported to Sahgal that Borick was not interested.

In November 1987 Sahgal approached Weiss again, with a letter from Trafalgar Holdings Ltd. authorizing Rana/Vista to act as its broker in discussions with Superior. At Sahgal's request Weiss again contacted Borick to express Sahgal's interest in pursuing a transaction; again Borick stated he was not interested in a transaction. Weiss passed this message to Sahgal.

Sahgal then called an acquaintance at Prudential–Bache Securities ("Pru–Bache") in New York, to see if Pru–Bache would be interested in pursuing a transaction with Superior. Analyst Richard Groberg at Pru–Bache reviewed Sahgal's analysis of a leveraged buy out of Superior. In mid-January

1988 he brought in Larry Nathanson, a vice president in Pru–Bache's mergers and acquisitions department, to evaluate the feasibility of acquiring Superior. Nathanson stated that Sahgal gained Pru–Bache's interest by telling them he could "deliver" Borick in a friendly transaction, that he was working with a member of Superior's Board of Directors (Weiss), and that Borick was interested in a transaction and had agreed to meet with him if he had financing. Absent such cooperation by Superior, Pru–Bache would not have entertained the possibility of doing a transaction. Groberg and Nathanson also testified that they explained to Sahgal the procedure for authorizing Pru–Bache's involvement, which consisted of review by several committees following meetings with the target company's management. They stated that they made clear to Sahgal their lack of authority to commit Pru–Bache to a transaction prior to these events.

Nathanson worked with Sahgal to refine Sahgal's analysis of the Superior acquisition and expressed Pru–Bache's willingness to participate in a transaction. At Sahgal's request, Nathanson agreed to send an introductory letter to Borick at Superior, expressing in a general way Pru–Bache's interest in participating in a transaction. Nathanson understood that Sahgal was to hand-deliver it in a meeting Sahgal was to have with Borick. Nathanson sent the signed letter on Pru–Bache letterhead to Sahgal for hand delivery to Borick. Sahgal did not meet with Borick; instead Rana/Vista had the letter delivered by messenger with a cover letter from Rana/Vista.

Borick responded two days later by telephone, confirmed by letter (which Sahgal adamantly denies receiving), that Superior had no interest in being acquired or in a management-led leveraged buy out. Sahgal told Nathanson that Borick wanted an offer price in order to evaluate the letter. He did not disclose that Borick had rejected his overture. At Sahgal's request, Nathanson agreed that Rana/Vista and Pru–Bache would communicate a price to Borick. Sahgal characterized the price as a "firm price," and the offer subsequently conveyed as a "firm price offer," although he understood that the transaction itself was subject to contingencies and that the price was subject to adjustment. Nathanson regarded it as merely a preliminary indication to Superior of Pru–Bache's degree of interest.

The letter Nathanson authorized stated that Rana/Vista "along with Prudential–Bache Securities, Inc. and its affiliates are *prepared to offer* sixteen dollars per share, payable in cash, to all of the shareholders of Superior Industries International, Inc." (Emphasis added.) It also stated that the offer was based solely on public information; that they wanted to meet with the company and would revise the bid if warranted by the company's internal business plans; that the offer was conditioned on legal and financial due diligence; and that they were "prepared to commit the resources" to do the deal quickly. The letter was sent to Borick on Monday morning, February 8, 1988.

Around noon that day, Sahgal asked his office manager Barbara Blackmore to write a press release, using the information in Pru–Bache's introduction letter, Rana/Vista's cover letter and the joint offer letter. Sahgal claimed he believed the offer had to be disclosed to the market, but also admitted he wanted to pressure Borick to present the offer to Superior's board of directors. Sahgal reviewed the release and made no significant changes in it; near close of business on February 8, Blackmore sent the release by fax to various news services. The press release stated:

> New York based Prudential–Bache Securities, Inc. and Los Angeles based The Vista Group, Ltd. announced today that they had made a firm offer in a letter to Mr. Louis Borick, Chairman of the Board and President of Superior Industries International, Inc., to acquire all of the outstanding stock of Superior Industries International, Inc. at $16.00 per share in a leveraged buy-out transaction. "Such a transaction would deliver to the shareholders of Superior a significant premium over the current market value of their shares" said Vipin Sahgal of The Vista Group, Ltd. Prudential–Bache Securities, Inc. and The Vista Group, Ltd. stated they have ample resources available to effectuate the transaction quickly.

The news appeared on financial news services around 8:00 a.m. on Tuesday, February 9. The AMEX suspended trading in Superior's stock, and no shares were traded on February 9.

During the course of the day, Rana/Vista, Pru–Bache, and Superior made numerous statements to the media. Pru–Bache first issued a statement denying any involvement with Rana/Vista. In answer to various media inquiries, Rana/Vista confirmed the information in its previous release. Superior issued a statement acknowledging a communication from Rana/Vista and Pru–Bache, but denying it was engaged in discussions or had signed a letter of intent. Pru–Bache later issued another statement acknowledging some involvement with Rana/Vista, but declaring the relationship terminated. At the close of business on February 9, Rana/Vista issued the following release:

> Vista Group Ltd. intends to pursue the acquisition of Superior Industries.
>
> Representatives of Vista will seek to meet with Superior Industries to discuss the proposed acquisition and with Prudential–Bache Securities, Inc. to determine Prudential–Bache's interest, if any, in participating with Vista in the proposed acquisition. A legal representative of Prudential–Bache has indicated that he does not believe that Prudential–Bache is interested in meeting with Vista to further discuss the proposed acquisition.
>
> Vista's plans are subject to the availability of financing, customary due diligence and compliance with applicable securities laws.
>
> Vista intends to issue a further statement following its proposed meetings with Superior and Prudential–Bache.

On February 10, AMEX reopened trading in Superior's stock. The stock price surged upward on strong volume, opening at $15.00 per share. It had closed at $11.50 on February 8. By the close of the day, the price had dropped to $13.625, still substantially above the pre-announcement price. Neither Sahgal nor Rana/Vista, nor Pru–Bache, purchased or sold any Superior securities.

The SEC filed a complaint seeking permanent injunctive relief against the Defendants, alleging that the initial press release contained materially false and misleading statements in that no "firm" offer had been made for Superior, and Pru–Bache had "announced" nothing. Following Rana/Vista's default and Sahgal's bench trial, the district court entered judgment for the SEC and permanently enjoined Defendants from violating section 10(b) and Rule 10b–5. This appeal followed.

## II

Defendants argue that the SEC failed to establish a violation of section 10(b) and Rule 10b–5 because it failed to show any purchase or sale of securities in reliance on their misrepresentations. Because the AMEX stopped all trading in Superior's stock on February 9 and did not reopen trading until after Pru–Bache and Superior had released curative information, Defendants contend that no one purchased or sold any Superior stock "in connection with" their statements. They argue that someone, although admittedly not the SEC, must have bought or sold in reliance on their statements to cause a 10b–5 violation.

### A

Defendants' argument treats the concepts of "reliance" and "in connection with" as interchangeable, but they are distinct. An express prerequisite to a violation of section 10(b) [1] and its implementing rule [2] is fraudu-

---

1. In pertinent part, section 10(b) of the Securities Exchange Act of 1934 provides:

   It shall be unlawful for any person ...
   (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....
   15 U.S.C. § 78j(b) (1988).

2. Securities Exchange Commission Rule 10b–5 provides:

   It shall be unlawful for any person, directly or indirectly, ...
   (a) To employ any device, scheme, or artifice to defraud,
   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

lent conduct "in connection with the purchase or sale of any security."

We have said that the "in connection with" requirement is met if the fraud alleged "somehow touches upon" or has "some nexus" with "any securities transaction." *SEC v. Clark*, 915 F.2d 439, 449 (9th Cir.1990). Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the "in connection with" requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission. *See In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 963, 965 (2d Cir.1993). The genesis of this rule is the early case of *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), which established that the connection requirement is satisfied "whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public." 401 F.2d at 862; *accord SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1171 (D.C.Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). While interpretations of "in connection with" continue to change as applied to private plaintiffs,[3] its meaning in SEC actions remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors. *See SEC v. Hasho*, 784 F.Supp. 1059, 1106 (S.D.N.Y. 1992) ("any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b–5."); *SEC v. Benson*, 657 F.Supp. 1122, 1131 (S.D.N.Y.1987) (misstatements in annual and quarterly reports satisfy connection requirement because an investor would rely on such documents in deciding whether to purchase securities); *SEC v. Warner*, 652

F.Supp. 647, 651 (S.D.Fla.1987) (allegation that fraud affected market for publicly traded security established "in connection with" element sufficient to withstand motion to dismiss); *SEC v. Joseph Schlitz Brewing Co.*, 452 F.Supp. 824, 829 (E.D.Wis.1978) (material omissions from press releases and SEC filings satisfied connection requirement because reasonable investor might rely thereon and information is calculated to influence investors); *SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1257 (D.D.C.1975) (material omissions from annual reports, proxy statements and 13 D Schedules satisfied connection requirement because investors might have based investment decisions upon documents).

Defendants' issuance of the February 8 press release, coupled with the public trading in Superior stock thereafter, satisfies the "in connection with" requirement. The false information pertained to the value of the stock and the existence of a firm deal with a recognized investment bank as a transaction partner. Fraud touching the intrinsic value of securities and the means of accomplishing the purchase of securities is sufficiently connected with securities transactions to bring the fraud within section 10(b). *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981); *cf. In re Financial Corp. of Am. Shareholder Litig.*, 796 F.2d 1126, 1130 (9th Cir.1986) (deception not relating to merits of securities nor to any factor reasonably linked to purchase is not "in connection with" purchase). Moreover, Sahgal intended to affect the market for Superior's stock, as evidenced by his statement that he issued the release in part to "pressure" Borick to present the offer to Superior's board of directors. Statements "calculated" to influence investors meet the

---

made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

**3.** *Compare, e.g., Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1485–86 (9th Cir.1991) ("in connection" element of Rule 10b–5 requires pri-

vate plaintiff to show several types of causation) *with Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1327–28 (8th Cir.1991) (Rule 10b–5 requires showing of loss causation and transaction causation, variously characterized as causation in fact, but for causation, reliance, or in connection with the purchase or sale of any security), *aff'd on other grounds*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

"in connection with" requirement. *SEC v. Hasho*, 784 F.Supp. at 1106.

Defendants contend that the requisite connection was severed by the release of curative information following the initial press release. "[N]ot every mixture with the true will neutralize the deceptive." *Virginia Bankshares, Inc. v. Sandberg*, — U.S. —, —, 111 S.Ct. 2749, 2760, 115 L.Ed.2d 929 (1991). Given the grain of truth embedded in Rana/Vista's release, somewhat confirmed by the qualified denials issued by Superior and Pru–Bache, it is not surprising that the series of purportedly "curative" statements released by all parties on February 9 were "not credibly perceived by the market," according to the SEC's expert, and failed to squelch investor speculation ignited by the February 8 press release. While Defendants may have ceased their misrepresentations, it cannot be said that investors were fully aware of all of the facts and were no longer deceived. *Cf. Shivers v. AMERCO*, 670 F.2d 826, 830 (9th Cir.1982) (fraud was not "in connection with" plaintiffs' sales of securities where plaintiffs were fully aware of facts and were not deceived when they sold shares). The transactions that occurred were thus still "touched" by the misleading press release for some period of time following its denouncement.

## B

■ Defendants argue that the SEC was required to plead and prove that "at least one investor actually received, read and relied upon the statements contained in the Vista release … and, in reasonable reliance thereon, … actually purchased (or sold) shares of Superior stock as a result…." Appellants' Brief at 40.[4] This circuit has not yet ruled on the issue of whether the SEC must prove reliance to establish a violation of

Rule 10b–5 and section 10(b) and the need for injunctive relief.

In approaching this question, we bear in mind that an SEC action to enjoin securities violations is not an action "under" Rule 10b–5, as is the judicially created cause of action for damages implied for private plaintiffs. *SEC v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993), *petition for cert. filed*, 62 U.S.L.W. 3061 (U.S. July 16, 1993) (No. 93–97); *cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975) (recognizing private action under Rule 10b–5 as "judicial oak" grown from "legislative acorn"). Rather, it is a "creature[ ] of statute," *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir.1975), legislatively authorized under sections 21(d) and (e) of the Securities Exchange Act, 15 U.S.C. §§ 78u(d) & (e) (1988 & Supp. III 1991).

This distinction is fundamental. The bulk of cases requiring proof of reliance as an element of a Rule 10b–5 violation expressly qualify this holding to actions brought by private plaintiffs seeking damages. Those that do not are nonetheless factually distinguishable on the basis that each involved private plaintiffs claiming damages, rather than the SEC seeking injunctive relief. *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) ("We agree that reliance is an element of a Rule 10b–5 cause of action."); *Raschio v. Sinclair*, 486 F.2d 1029, 1030 (9th Cir.1973) (complainant must show a purchase or sale in reasonable reliance to prevail on Rule 10b–5 claim). Only one case, *SEC v. Murphy*, 626 F.2d 633 (9th Cir.1980), appears to support Defendants' claims. *Murphy* involved an SEC proceeding for injunctive relief from insider trading violations. In concluding that reliance was not a necessary element of the particular case, the court implied that the

---

4. Defendants also claim, erroneously, that the SEC was required to prove injury. It is not. *See SEC v. Rind*, 991 F.2d 1486, 1490 (9th Cir.1993) (stating injury is not an element of SEC claim for disgorgement of profits under rule 10b–5), *petition for cert. filed*, 62 U.S.L.W. 3061 (U.S. July 16, 1993) (No. 93–97). The SEC need not prove injury in an action to enjoin violation of § 206 of the Investment Advisers Act. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195,

84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963); *SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir.1977). Section 206 parallels section 10(b) of the Exchange Act in prohibiting "any act, practice, or course of business which is fraudulent, deceptive or manipulative." 15 U.S.C. § 80b–6(4) (1988). As with Rule 10b–5, a Commission rule implements section 206 in part by prohibiting untrue, false or misleading statements. *See* 17 C.F.R. 275.206(4)–1.

SEC must establish reliance in some cases. 626 F.2d at 652 n. 23 ("Reliance ... is not a necessary element in actions for securities fraud *when the fraudulent act charged involves an omission....* Reliance continues to be unnecessary to 10b–5 liability *for material omissions* after *Chiarella [v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348] [ (1980) ].") (emphasis added). This remark, however, is dicta, and we do not think it persuasive.

The reliance requirement is not found in Rule 10b–5 itself; it is one of the judicially created elements of and limitations on a private 10b–5 action. These requirements are largely directed toward identifying who has standing to enforce the antifraud laws. *See Blue Chip Stamps,* 421 U.S. at 734–36, 95 S.Ct. at 1924–26; *In re Nucorp Energy Sec. Litig.,* 772 F.2d 1486, 1489–90 (9th Cir.1985); *SEC v. Materia,* 745 F.2d 197, 202 (2d Cir. 1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). But where the SEC is concerned, that matter is settled: Congress designated the SEC as the primary enforcement agency for the securities laws. In adopting the rule that only an actual purchaser or seller may maintain a private damage action under Rule 10b–5, the Supreme Court took care to state that "the purchaser-seller rule imposes no limitation on the standing of the SEC to bring actions for injunctive relief under § 10(b) and Rule 10b–5." *Blue Chip Stamps,* 421 U.S. at 751 n. 14, 95 S.Ct. at 1933 n. 14.

Judicial decisions defining the conduct necessary to constitute a Rule 10b–5 *violation* do apply to actions by the SEC as well as private parties. Thus, *scienter* is a necessary element of an SEC action to enforce section 10(b) and Rule 10b–5, as well as a private action, because it is required to meet the statutory elements of manipulation and deception. *Aaron v. SEC,* 446 U.S. 680, 690–91, 100 S.Ct. 1945, 1952–53, 64 L.Ed.2d 611 (1980); *SEC v. Murphy,* 626 F.2d at 653–54. The same is true of the "in connection with the purchase or sale of any security" element, discussed above. But restrictions on who may invoke the power of the federal judiciary to enforce the securities laws by collecting damages do not bear on the deter-

mination of whether a violation of the securities laws has been committed. *Cf. Mutual Shares Corp. v. Genesco, Inc.,* 384 F.2d 540, 546–47 (2d Cir.1967) (rejecting claim for damages on insufficient proof of loss and causal connection with violation, but granting injunctive relief against violation of Rule 10b–5). Conduct may be fraudulent and so violate Rule 10b–5, exposing the perpetrator to liability, but may not result in the types of harm necessary to subject the actor to liability to a particular private plaintiff. *See Clark,* 915 F.2d at 445 (discussing same conclusion by Second Circuit in *SEC v. Materia,* 745 F.2d at 202)); *cf. Shivers,* 670 F.2d at 829 (declining to decide whether conduct violated section 10(b) and Rule 10b–5 on finding that plaintiffs lacked standing).

Both the Sixth and Second Circuits hold that reliance is not an element the SEC must prove to enjoin violations of the securities laws. *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985) (per curiam); *SEC v. North Am. Research & Dev. Corp.,* 424 F.2d 63, 84 (2d Cir.1970). In the Second Circuit, the SEC must prove four elements to establish a misrepresentation violating Rule 10b–5, and a fifth element to establish the need for an injunction: (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, (4) use of the jurisdictional means, and (5) a reasonable likelihood of future violations. *SEC v. Hasho,* 784 F.Supp. at 1106, 1110; *SEC v. Tome,* 638 F.Supp. 596, 620 & n. 46 (S.D.N.Y.1986).

We agree with the Sixth and Second Circuits. We hold that reliance is not an element of a Rule 10b–5 violation by misrepresentation; rather, it is an element of a private cause of action for damages implied thereunder.[5] The SEC need not prove reliance in its action *for injunctive relief* on the basis of violations of section 10(b) and Rule 10b–5.

The decision of the district court denying Defendants' motion for summary judgment is AFFIRMED.

---

**5.** Reliance is not an element of every private claim. *See, e.g., Clark,* 915 F.2d at 443 (reliance

not among elements for insider trading violations of Rule 10b–5).